540 F.2d 174
 Nancy May DOUGHERTY, Administratrix of the Estate of Wayne
Dougherty, Deceased, Appellant,
v.
HOOKER CHEMICAL CORPORATION (Subsidiary of Occidental
Petroleum Corporation) et al., Third-Party Plaintiffs,
v.
BOEING VERTOL COMPANY, Third-Party Defendant.
 No. 75-2270.
 United States Court of Appeals,
Third Circuit.
 Submitted May 4, 1976.
Decided July 30, 1976.
As Amended Sept. 8, 1976.
 
 Herbert Monheit, Tod I. Mammuth, Philadelphia, Pa., for appellant.
 Donald J. P. Sweeney, Thomas E. Thomas, McWilliams & Sweeney, Philadelphia, Pa., for appellee.
 Curtis Wright, Timoney, Knox, Avrigian & Hasson, Ambler, Pa., for Boeing Vertol Co., third party defendant.
 Before ALDISERT, GIBBONS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Plaintiff, as administratrix, brought this diversity action against Hooker Chemical Corporation, a manufacturer of trichloroethylene (hereinafter called "TRI"). She alleged, among other things, that Hooker failed to give adequate warnings of the dangers and fatal properties of TRI, and as a result, her husband by working with TRI sustained injuries which eventually led to his death. At the close of the plaintiff's case, which had been limited solely to the adequacy of the warnings given by Hooker, the district court granted Hooker's motion for a directed verdict. We reverse.
 
 I.
 
 2
 Wayne Dougherty, the plaintiff's decedent, was employed by Boeing Vertol Company in Pennsylvania as a helicopter transmission rebuilder. His primary duty was to disassemble, clean and then reassemble military helicopter transmissions. Dougherty's work was performed in two buildings in which were located degreasing tanks each containing 200 gallons of TRI heated to a temperature in excess of 190o F. The disassembled helicopter parts were cleaned by submerging them into the TRI.
 
 
 3
 The TRI used in the degreasing operation was supplied to Boeing by Hooker. The TRI was packaged, shipped and stored in 55 gallon drums. Affixed to the drum was the following warning:
 
 
 4
 Hooker had also prepared and submitted to Boeing a "Data Sheet for Toxicological and Safe Handling Information" which listed the following health hazards from inhalation of TRI vapor:
 
 
 5
 Victim may experience nausea and vomiting, drowsiness, acquire an attitude of irresponsibility and behave in a manner resembling any stage of alcoholic intoxication.
 
 
 6
 As to precautions for normal use, the data sheet recommended "good housekeeping and normal operating procedures."
 
 
 7
 In addition to the warnings submitted by Hooker, Boeing had in its possession Chemical Safety Data Sheet SD-14 prepared by the Manufacturing Chemists Association (MCA) which discussed the safe handling and use of TRI. The fifteen page MCA data sheet listed several health hazards including the possibility of death from acute and subacute TRI poisoning.
 
 
 8
 Dougherty who had been employed by Boeing for several years prior to his death in January, 1971, died of cardiac arrest, the cause of which a consulting physician believed to be TRI poisoning. The complaint, filed in the Eastern District of Pennsylvania, asserts among other claims that Hooker failed to adequately warn of the dangerous nature of TRI.[1]
 
 
 9
 The pretrial order directed the "warnings" issue be tried first and apart from the other issues of liability and damages. At the conclusion of the plaintiff's case on warnings, Hooker moved for a directed verdict on the ground that the warnings were sufficient as a matter of law. The district court in an oral opinion granted Hooker's motion, holding that the warnings given were adequate and that, in any event, Boeing was independently aware of the possible fatal consequences of TRI inhalation.[2] This appeal followed the entry of judgment for Hooker.
 
 II.
 
 10
 As stated, the plaintiff sought recovery against Hooker based primarily on theories of strict liability and negligence. The intermingling at trial of these theories of liability (Restatement (Second) of Torts §§ 388 and 402A)[3] requires a brief reference to both concepts as they bear upon the instant action. Section 402A strict liability arises from the sale of any product in a defective condition unreasonably dangerous to the user or consumer. Pennsylvania holds that a product which contains inherent dangers is defective when sold if not accompanied by sufficient warning.[4] Under such circumstances, the seller is held to strict liability if such a defective product reaches the ultimate consumer "without substantial change in the condition in which it is sold." Section 402A(1)(b).
 
 
 11
 Under § 388, liability arises when the seller, having reason to know that its product is likely to be dangerous for its intended use, and having no reason to believe that the intended user will realize its dangerous condition, nevertheless fails to exercise reasonable care to inform the user of the dangerous condition. Thus, the differences between the two concepts have been stated as:
 
 
 12
 In strict liability it is of no moment what defendant 'had reason to believe.' Liability arises from 'sell(ing) any product in a defective condition unreasonably dangerous to the user or consumer.' It is the unreasonableness of the condition of the product, not of the conduct of the defendant, that creates liability.
 
 
 13
 Jackson v. Coast Paint and Lacquer Company, 499 F.2d 809, 812 (9th Cir. 1974).
 
 
 14
 Here, as we have noted, both theories were pleaded and apparently acknowledged by the parties and the court. The plaintiff, while asserting in its brief on appeal that it had established a prima facie strict liability case under § 402A, nevertheless refers to the various elements of § 388 to support its position that the defendant Hooker did not warn Boeing's employees. The defendant's response is also in terms of "adequate warnings" and implicates the negligence concept of § 388. The district court's opinion which focuses overall on the requirement of warnings apparently addressed itself to both theories when it granted the defendant's motion for directed verdict.
 
 
 15
 We find it unnecessary to discuss or to decide the applicability of § 402A in this factual context or whether the warning requirements under Pennsylvania law of § 402A[5] are the same or more stringent than those of § 388, for we are satisfied that a jury question was presented with respect to Hooker's exercise of reasonable care under § 388. In such a situation, it would be error to grant a directed verdict for the defendant if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability. Rochester Civic Theatre, Inc. v. Ramsay, 368 F.2d 748 (8th Cir. 1966); Vareltzis v. Luckenbach Steamship Company, 258 F.2d 78 (2d Cir. 1958); Clark v. McNeill, 25 F.2d 247 (5th Cir. 1928).
 
 III.
 
 16
 Therefore, putting aside considerations of strict liability, we turn to those principles of negligence law which are embodied within § 388 to determine whether as a matter of law, Hooker, the manufacturer of TRI, exercised reasonable care to warn Boeing's employees of the dangerous properties of TRI. Thus, for Hooker to be held liable, all the conditions of § 388 (see n.3 supra ) must be met. Suchomajcz v. Hummel Chemical Company, 524 F.2d 19 (3d Cir. 1975). Here, however, the trial court limited the only liability issue to be tried at this stage to the adequacy of the warnings, the third requirement of § 388. For our purposes, therefore, we too restrict our review to the evidence concerning only subsection (c) of § 388 (i. e.); whether Hooker failed "to exercise reasonable care to inform them (the employees of Boeing) . . . of the facts which made it (TRI) likely to be dangerous." Stated otherwise, in the context of this case, were the TRI warnings given by Hooker to Boeing sufficient to the extent that reasonable men could not differ in finding that Boeing was so activated or "triggered" by the Hooker warnings that it would necessarily inform its employees of all TRI's dangerous propensities.
 
 IV.
 
 17
 Comment n to § 388 is concerned with warnings given to third persons. It states in pertinent part:
 
 
 18
 Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it. . . . It is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe. . . .
 
 
 19
 Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them, and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result . . . .
 
 
 20
 Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing. It may well be that he should take the risk that this information may not be communicated . . . (I)f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.
 
 
 21
 The care to be exercised in discharging the duty to warn is therefore measured by the dangerous potentialities of the commodity as well as the foreseeable use to which it might be put. Thus, when Hooker sold TRI to Boeing, Hooker was required to exercise reasonable care in conveying to those who might use TRI or who might work with it, a fair and adequate warning of TRI's dangerous potentialities, to the end that the ultimate user might be sufficiently appraised of the possible consequences of exposure to or use of TRI. That duty under the principles of § 388, comment "n ", may be discharged by the supplier under appropriate circumstances by warnings given solely to its purchaser. Under other circumstances, steps may have to be taken by the supplier even beyond the warnings given to the purchaser. The determination of whether the method or means utilized to warn is sufficient will depend upon a balancing of considerations involving among other factors, the dangerous nature of the product, the form in which the product is used, the intensity and form of the warnings given, the burdens to be imposed by requiring warnings, and the likelihood that the particular warning will be adequately communicated to those who will foreseeably use the product. Thomas v. Arvon Products Company, 424 Pa. 365, 227 A.2d 897 (1967); Seibel v. Symons Corporation, 221 N.W.2d 50 (N.D.1974); West v. Broderick & Bascom Rope Company, 197 N.W.2d 202 (Iowa 1972); Younger v. Dow Corning Corporation, 202 Kan. 674, 451 P.2d 177 (1969); Tampa Drug Co. v. Wait, 103 So.2d 603, 75 A.L.R. 765 (Fla.1958); Weekes v. Michigan Chrome & Chemical Company, 352 F.2d 603 (6th Cir. 1965).
 
 
 22
 The determination as to whether the supplier's duty measured by these considerations has been reasonably discharged comes within the function of the trier of fact. Here, however, the district court resolved that issue without permitting it to reach the jury. By so doing, it in effect held that the record was critically deficient of that minimum quantum of evidence from which a jury might reasonably find liability. Denneny v. Siegal, 407 F.2d 433, 437-440 (3d Cir. 1969). See also Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976).[6] While the district court did not articulate the standard which it employed in directing the verdict for the defendant, our concern is not with the standard utilized but with its application. We thus turn to the evidence to assess the correctness of the district court's ruling.
 
 V.
 
 23
 Referring then to the evidence, the relevant record developed by plaintiff with respect to warnings reveals that:
 
 
 24
 (1) The 55 gallon drums of TRI sold by Hooker had warnings affixed to them stating:
 
 
 25
 "VAPOR HARMFUL"
 
 
 26
 "Use only with adequate ventilation. Avoid prolonged or repeated contact with skin. Do not take internally."
 
 
 27
 (2) The Hooker label resembled the warning on the MCA Chemical Safety Data Sheet SD-14, but the label made no reference to that document.
 
 
 28
 (3) The Hooker label did not warn of the possibility of death. The MCA data sheet, however, does refer to the possibility of death resulting from acute and subacute TRI poisoning.[7] Hooker had knowledge of the MCA's requirements and of the MCA's TRI warning labels.
 
 
 29
 (4) The 55 gallon TRI drums were stored by Boeing outside the buildings where the degreasers were in use. The 200 gallon TRI degreasers were within the Boeing buildings where Dougherty worked.
 
 
 30
 (5) The Hooker data sheet prepared for Boeing made reference to only the following health hazards which could result from the inhalation of TRI vapor: nausea, vomiting, drowsiness and acquiring an attitude of irresponsibility. Significantly, absent from the "Data Sheet for Toxicological and Safe Handling Information" which Hooker had prepared and submitted to Boeing was any reference to the possibility that death might be caused by the prolonged inhalation of TRI.
 
 
 31
 (6) David Shaulter, a co-worker of Dougherty, testified that he had never seen any warnings, no matter their content, on the degreasers which were inside the Boeing plant.
 
 
 32
 (7) Boeing, through its Manager of Safety Administration and Industrial Hygiene, James Parmiter, testified to the contrary claiming that signs were placed by Boeing on the degreasers. These signs, according to Parmiter, listed the procedures to be utilized in handling TRI and the precautions to be taken with respect to ventilation, breathing inhalation and skin exposure. No mention was made by Parmiter during his testimony that these warnings, which he claimed were posted on the degreasers, advised of the possibility of fatal consequences that might result from prolonged inhalation of TRI.
 
 
 33
 (8) The MCA Chemical Safety Data Sheet SD-14 was in Boeing's files but had not been supplied by Hooker.[8] It is that document that states that death may result from acute or subacute TRI poisoning.
 
 
 34
 (9) In 1966, Boeing had prepared "Industrial Hazards Control Bulletin No. 18" which stated that TRI was dangerously toxic.
 
 
 35
 (10) On direct examination, Parmiter also testified that he understood the possible effects of inhaling TRI vapor to be limited solely to nausea, dizziness and some form of narcotic effect. On cross examination he acknowledged familiarity with the MCA data sheet, but denied knowledge that the safety literature contained information about the fatal effects that could result from inhaling TRI over an extended period of time. However, when referred specifically to relevant sections of Boeing's own safety literature, he acknowledged that excessive inhalation of TRI vapors could result in death.
 
 VI.
 
 36
 Although Hooker argues in its brief that its warnings were adequate as a matter of law,[9] based on the summarized evidence, supra, it is apparent that a jury could reasonably find:
 
 
 37
 (1) that Hooker, trading in a commodity "burdened with a latent danger which could prove fatal," see Tampa Drug Co. v. Wait, 103 So.2d 603, 75 A.L.R.2d at 775, had knowledge of safety literature which warned of the possibility of death from acute or subacute TRI poisoning.
 
 
 38
 (2) that Hooker at no time included such a warning in its safety literature or on its labels.
 
 
 39
 (3) that no such warnings of possible death resulting from the use of TRI were communicated by Hooker or by Boeing to Boeing's employees.
 
 
 40
 (4) that because of the fatal propensities of TRI, Hooker was obliged to take reasonable steps beyond what appears in the record to warn Boeing's employees (see § 388, comment n, pp. 8-9 supra ).
 
 
 41
 (5) that there was no reasonable basis for Hooker to rely on Boeing's independent knowledge of the fatal properties of TRI.[10] Nor was there a reasonable basis for Hooker to rely upon Boeing giving appropriate information to its employees of all the hazards of working with TRI. (See § 388, comment n, pp. 8-9 supra ).
 
 
 42
 In sum, a jury could have found that Hooker had not exercised reasonable care in informing TRI users of all TRI's dangers.
 
 
 43
 We therefore deem it incumbent on this record for the jury, not the court, to resolve Hooker's eventual liability as to warnings. Similarly, on this record, it is the jury's function to determine, after balancing the § 388 considerations to which we have referred, whether Boeing's knowledge, if any, could have relieved Hooker from any requirement to warn Boeing's employees and thus, from any liability.[11]
 
 VII.
 
 44
 Concluding that the plaintiff has introduced sufficient evidence to create a triable issue as to the adequacy of warnings, we therefore hold that the district court erred in having granted the defendant's motion for a directed verdict at the close of the plaintiff's case. We will reverse and remand for proceedings consistent with this opinion.
 
 
 45
 ALDISERT, Circuit Judge (dissenting).
 
 
 46
 I would affirm the judgment of the district court for the reasons set forth by Judge John P. Fullam at trial. This court is again faced with predicting the outer limits of products liability that may ultimately be imposed by the Pennsylvania appellate courts under negligence and strict liability theories. The precedential and institutional value of our various opinions in this field is at best conjectural, and will depend upon how far Pennsylvania courts intend to extend liability.
 
 
 47
 The majority is predicting that the Pennsylvania courts will hold that there were insufficient warnings here to protect the manufacturer as a matter of law from a products liability claim based on § 388: that it was not enough for the manufacturer to prove that (1) the purchaser of the product (here, the employer of plaintiff's decedent) "knew all of the details concerning the dangerous characteristics of this product" and (2) the manufacturer placed large warning labels on the drums and forwarded literature explaining the dangers and advising precautions. It is my prediction that the Pennsylvania appellate courts will hold these warnings to be sufficient as a matter of law to protect the manufacturer from a products liability claim whether predicated on negligence or strict liability. Any failure by the employer to warn his employee would be the subject of litigation implicating only the employer and employee.
 
 
 48
 Accordingly, I would affirm for the reasons stated by Judge Fullam in open court:
 
 
 49
 Under our law, the plaintiff would be entitled to recover from the manufacturer of trichloroethylene if the plaintiff's decedent's death was caused by the exposure to that product and if the product was in what is known in the law as a defective condition, unreasonably dangerous to the user or consumer.
 
 
 50
 Under the law a product can be in a defective condition if at the time it left the manufacturer's hands it had a defect which rendered it dangerous to the user; and so far as the law is concerned, a defect can consist of failure to warn the purchaser of that product of any dangers inherent in the product.
 
 
 51
 In other words, a manufacturer is not required to produce a product which is guaranteed not to cause harm under any circumstances. Obviously, a vast percentage of the products which are used in our society today do have some potential for harm.
 
 
 52
 The manufacturer, however, does have a duty to warn of any dangers inherent in the product.
 
 
 53
 In this case the evidence is undisputed that when the product was sold by the Hooker Chemical Company to the Boeing Vertol Company, it was accompanied by warnings in the form of the labels on the drums, D-1 and D-2, and also that it was accompanied by various items of literature which are in evidence, including the data sheet.
 
 
 54
 I rule as a matter of law that those warnings were adequate. They did include warnings in substance of every adverse effect that could be caused by the product, and they did, in fact, inform of every precaution which should be taken in handling the product.
 
 
 55
 I would point out that this is not a case in which the plaintiff is suing the employer. Whether or not the employer adequately protected the rights of its employees, whether it adequately warned employees of the hazards involved in working near this degreasing process is not a matter which can be litigated in this case.
 
 
 56
 As you perhaps know, an employee cannot sue his employer for damages, but rather has a claim for benefits under workmen's compensation laws and under certain occupational safety laws which apply.
 
 
 57
 In this case, for reasons which do not appear, the plaintiff's decedent did file a claim against the employer for workmen's compensation, but chose not to prosecute that claim, in consequence of which the claim was dismissed for lack of prosecution.
 
 
 58
 The suit here is against the manufacturer of the chemical.
 
 
 59
 I would point out also that insofar as the manufacturer is concerned, under our law there is no duty whatever to warn of things which are known to the purchaser.
 
 
 60
 In this case it is uncontradicted and absolutely clear that the purchaser of the chemical, the Boeing Vertol firm, knew all of the details concerning the dangerous characteristics of this product and had full and complete knowledge of the hazards involved, the risks involved, and of the proper method of dealing with those risks. So that in my view under no circumstances could there be an issue of fact for a jury to resolve as to whether the defendant chemical company breached any duty that it owed to the plaintiff in this case.
 
 
 61
 Accordingly, I am granting the motion for directed verdict, and you will not be required to pass upon any issue in the case.
 
 
 62
 Appendix 305-07.
 
 
 
 [1]
 In addition to theories of negligence and strict liability both of which were predicated on inadequate warnings, the complaint also alleged causes of action for breach of warranty, outrageous conduct and various other torts. The pretrial order limited the trial of liability solely to the issue of the adequacy of warnings given by Hooker, but in so doing, did not delineate any particular theory. In its oral opinion, the district court utilized language characteristic of strict liability and negligence theories. Similarly, the parties on appeal have made no effort to distinguish between either theory nor have they analyzed the cases which they have cited in terms of one theory or the other
 The complaint also named three other defendants. Two of these defendants were dismissed by stipulation. The third defendant was never served. Hooker filed a third party complaint against Boeing.
 
 
 [2]
 Although the only issue tried was the adequacy of the warnings, the district court's opinion also refers to the issue of causation. In discussing causation, the district court judge noted the paucity of such evidence, but nevertheless correctly observed that the only issue before him was the matter of warnings. Causation, not having been an issue before the district court, is not an issue which we consider
 
 
 [3]
 Pennsylvania, whose law is applicable in this diversity setting, has adopted § 402A, Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966) and § 388, Ebbert v. Philadelphia Electric Co., 330 Pa. 257, 198 A. 323 (1938)
 Section 402A "Special Liability of Seller of Product for Physical Harm to User or Consumer" provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 Section 388 "Chattel Known to be Dangerous for Intended Use" provides:
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 
 
 [4]
 Greiner v. Volkswagenwerk Aktiengeselleschaft, --- F.2d ----, 3d Cir. (1976); Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971); see, also, Comments h & j to § 402A Restatement (Second) of Torts
 
 
 [5]
 To our knowledge, Pennsylvania has yet to indicate the warning requirements of § 402A which would be applicable to the factual circumstances presented here. Had strict liability been the only theory on which the plaintiff proceeded (see Jackson v. Coast Paints Lacquer Company, 499 F.2d at 810), we might very well be obliged to predict the resolution of this issue by the Pennsylvania Courts. Suchomajcz v. Hummel Chemical Co., 524 F.2d 19, 24 (3d Cir. 1975). However, we need not do so here because, as noted, the pleadings and proofs also rely upon Hooker's negligence in the discharge of its duty to warn
 
 
 [6]
 The standard to be applied is the same under federal or Pennsylvania law. See Denneny v. Siegal, supra; Smith v. Bell Telephone Company of Pennsylvania, 397 Pa. 134, 153 A.2d 477 (1959); Devenney v. North Franklin Township Vol. Fire Dept., 209 Pa.Super. 378, 228 A.2d 61 (1967)
 
 
 [7]
 The MCA data sheet provides in pertinent part:
 
 
 [10]
 1 HEALTH HAZARDS
 
 
 [10]
 1.1 Trichloroethylene may be harmful by inhalation, by contact with skin or mucous membranes, or when taken by mouth. However, if proper precautions are constantly observed, this compound may be handled with safety. Prolonged, excessive, or repeated exposures to the liquid, or to atmospheric concentrations of the vapor above those recommended below are hazardous
 
 
 [10]
 1.4.1 Acute Poisoning
 When a worker inhales an excessive amount of trichloroethylene vapor within a short period of time, the symptoms are essentially those of production of anesthesia. There may be, at first, irritation of the eyes, nose and throat, then dizziness, nausea, vomiting and gradual suppression of consciousness. The picture which develops depends upon the concentration inhaled and the duration of inhalation. If the concentration is high and inhalation prolonged, there will eventually be complete suppression of pain sense and almost complete loss of muscular activity. After a period of very rapid breathing, the respiration and circulation may fall and death follow. High concentrations of trichloroethylene may prevent proper utilization of the oxygen of the blood by the tissues. When this condition is present, physical activity may lead to severe or even fatal circulatory failure.
 
 
 [10]
 1.4.2 Subacute Poisoning
 Subacute trichloroethylene poisoning may result from prolonged or repeated work in an atmosphere containing high concentrations of trichloroethylene but under conditions in which the amount absorbed is not sufficient to cause loss of consciousness.
 
 
 [8]
 The district court judge in his oral opinion evidently assumed that this document had been supplied to Boeing by Hooker. Our review of the evidence does not substantiate this fact. In light of Hooker's acquaintance with MCA requirements, it would make no difference to our disposition whether or not it was Hooker which supplied Boeing with this document
 
 
 [9]
 We find the relevant cases cited by Hooker in support of its position to be inapplicable to the factual and procedural posture of this case
 Younger v. Dow Corning Corporation, supra, which holds that a manufacturer that places adequate warnings on its product has no additional duty to warn the vendee's employees, did not involve a product with fatal properties and was submitted on stipulations of fact which included admissions that the warnings on the product labels were adequate, the very issue contested here.
 In Weekes v. Michigan Chrome & Chemical Company, supra, the court merely reversed a jury verdict for the plaintiff noting that a jury instruction which insinuated that the employee must get direct warnings in all cases was erroneous. There also the product in question did not have fatal properties as does TRI. The court held that proper jury instructions predicated on § 388 principles and respecting the supplier's exercise of reasonable care should have been given to the jury.
 Bertone v. Turco Products, 252 F.2d 726 (3d Cir. 1958) involves New Jersey law and does not discuss § 388. It involved no more than a dismissal of a third party complaint brought by the supplier against its purchaser for indemnification. While the opinion discusses similar concepts to that at issue here, it sheds no light on what is or is not an adequate warning in the context of the instant controversy.
 
 
 [10]
 It can be claimed that Boeing had knowledge of TRI's fatal properties inasmuch as Boeing had in its files safety literature which indicated all of the health hazards that could result from exposure to TRI. On this record, however, there is no evidence to support an assumption by Hooker that Boeing would communicate this knowledge to its employees. Nor is there evidence as a matter of law that Boeing had "effective" knowledge of TRI's fatal propensities. As the record reveals, while Boeing's safety manager ultimately acknowledged that TRI could cause death and that data sheets so stating reposed in Boeing's files, he nevertheless initially disclaimed any knowledge of TRI's fatal properties. It could be inferred by the jury that if Boeing's safety manager had no knowledge of the fatal consequences of prolonged inhalation of TRI, Boeing could not have taken steps to communicate this fact to its workers. At the very least his testimony with respect to his knowledge and hence, Boeing's knowledge, presented an issue of fact for the jury, Standard Oil Co. v. Lyons, 130 F.2d 965 (8th Cir. 1942), and could not be resolved by the district court in its grant of a directed verdict
 
 
 [11]
 Because of the limited scope of the issue tried to the jury, i. e., the adequacy of the warnings, we of course express no opinion as to any other aspect of the plaintiff's case