Geraldine WALMSLEY, Administratrix of the Estate of Thomas D. Walmsley, Deceased, and on her own behalf, Appellant,

v.

The CITY OF PHILADELPHIA and Gregor Sambor and Kevin Tucker, Police Commissioners of the City of Philadelphia, and Police Officer John Doe and other unknown and unnamed officers and agents of the City of Philadelphia Police Department, individually and in their capacity as officers of the City of Philadelphia, Police Officer David Grove, Badge #3407, Police Officer Ernest Colwell, Badge #7202, Police Officer Michael Valenti, Badge #2268, Police Officer Mark Goldberg, Badge #1967, Police Lt. Augustine Carre, Badge #98, Appellees,

v.

Robert WALMSLEY,
Third–Party Defendant.

No. 88–1507.

United States Court of Appeals,
Third Circuit.

Argued Jan. 11, 1989.

Decided April 12, 1989.

Rehearing and Rehearing In Banc
Denied May 12, 1989.

Mark B. Frost (argued), Frost, DeMesquita & Rudow, Philadelphia, Pa., for appellant.

Seymour Kurland, City Sol., Norma S. Weaver, Chief Deputy in Charge of Claims, Barbara R. Axelrod, Divisional Deputy in Charge of Appeals, Alan C. Ostrow (argued), Asst. City Solicitor, City of Philadelphia Law Dept., Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM, COWEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This civil rights action alleges that two Philadelphia police officers so brutally beat the deceased, Thomas Walmsley, that he died from head wounds inflicted by the officers. The district court granted the defendants' motion for a directed verdict at the conclusion of the plaintiff's case. Because we find that the plaintiff's evidence, when examined in a light most favorable to her position, could persuade a reasonable jury to conclude that Thomas Walmsley's civil rights were violated, we will reverse the judgment of the district court.

### I.

Since the issue before us is whether the district court properly granted defendants' motion for a directed verdict, we will summarize the evidence presented to the jury which would, if credited, support a verdict in favor of the plaintiff.[1]

### A.

Thomas Walmsley died on the morning of September 10, 1985, as the result of

---

1. The district court granted the defendants' motion following the conclusion of the plaintiff's case, and the defendants did not have an opportunity to present evidence which might counter or contradict the evidence presented by the plaintiff. Thus, the following should not be read as a summary of the "facts" of this case, but rather as a summary of the evidence presented, viewed in a light most favorable to the plaintiff. This is, of course, how we must view the evidence when reviewing a district court's grant of a motion for a directed verdict.

swelling of the brain, caused by multiple head injuries. In addition to bruising around his left eye and mouth areas, an autopsy done after his death revealed multiple and extensive contusions of his scalp.[2] According to expert testimony, these injuries were almost certainly caused by multiple blows to the head with a blunt instrument. App. at 315.3. An expert also testified that it was the head/scalp injuries, rather than the facial injuries, which caused the brain swelling resulting in Thomas Walmsley's death. App. at 235. Although a toxicology report produced after the autopsy also disclosed lethal levels of barbiturates and diazepam in Thomas Walmsley's ("Tom") body, an expert testified that in his opinion these drugs were not responsible for the brain swelling that caused Tom's death. App. at 298, 301. That expert also testified that it was unlikely Tom's injuries could have resulted from a fall, resulting in contact with a wall or rock, or from a fistfight, due to their severity, location, and the lack of external abrasions. App. at 293–97. He opined that it was possible the injuries were the result of being clubbed with a nightstick. App. at 293.

At the time of his death, Tom was twenty-six years old, about six feet four inches tall, and weighed approximately 230 pounds. He was employed as an independent contractor who repaired transmissions, and resided at 226 West Fisher Street, in Philadelphia, with his brother, Robert Walmsley ("Robert"), and two of his brother's friends, Billy Ray and Carl Hocher.

On the evening of September 9, 1985, Robert, Carl Hocher and another friend, James McHale were watching Monday Night Football at 226 West Fisher Street. Robert planned to have a meeting of the four persons living in the house following the game to discuss cleaning up the house, and the designation of specific individuals who would be responsible for particular chores. Since Billy Ray was working that evening, and his brother Tom was also out,

Robert planned for the meeting to take place at about midnight, after the game.

After Billy Ray returned from work, Robert telephoned his brother, who had since returned and was in his bedroom, to ask him to come to the meeting. When Tom did not answer the phone, Robert went up to his room to get him. After banging on the door, which produced no response, Robert opened the door to find Tom in bed with a woman Robert did not know. Tom became angry over the intrusion, while Robert was upset that Tom had brought a strange woman into the house, and an argument quickly ensued. The argument developed into a physical confrontation, and while accounts of the confrontation vary, several witnesses testified that the brothers were basically wrestling (not exchanging blows), until the last part of the fight, which took place outdoors in front of the house. Witnesses also testified that Tom's head did not bang into any hard object or structure, such as a wall, stair, or rock, throughout the confrontation. *See, e.g.*, app. at 68–69.

The parties agree that during the last part of the fight, several punches were exchanged, and Tom was struck two or three times in the face. Neighbors, meanwhile, had called the police, who arrived shortly thereafter and took Robert and a friend into custody. Witnesses observed Tom, then suffering from a swollen eye and bloody lip, drive away from the scene with his girlfriend. At no time during the confrontation did Tom lose consciousness or appear disoriented.

After leaving 226 West Fisher Street, Tom drove to his parents' house, about a ten minute drive. His mother testified that she applied ice to his eye, and brushed his hair back. His sister also testified that she touched her brother's face and hair. Tom was still angry and agitated. He told his family that he was going back to his brother's house to wreck everything there, and that he would get a gun and shoot anyone who came back to the house. Then, after sending his girlfriend home in a taxi, Tom

---

**2.** An expert pathologist testified that he had noted six impacts to the scalp and at least three impacts to the face. App. at 315. The expert's description of the injuries is at app. at 312–25.

left his parents' house and returned to his brother's house.

Upon arriving at his brother's house, Tom apparently carried out his promise, destroying an aquarium, televisions, video and electronic equipment, mirrors, lamps, and other breakable items. At about 1:00 a.m., Tom's sister Angelina Petel called Robert's house and spoke to Tom. Tom told her that he had wrecked everything. Tom, at that point, was the only person in the house.

Meanwhile, neighbors had again contacted the police. Officers Colwell and Valenti arrived at approximately 1:15 a.m. According to their testimony, they went to the front of the house. Colwell testified that he then went into the alley which led to the back of the house—with Valenti remaining behind—and that he saw Tom come out of the house, and in the area of the porch, landing, or steps behind the house, yell at the house. Valenti also testified that he saw Tom come out of the house, go down into the yard, and enter the alley while hollering in a loud voice. According to Colwell and Valenti, Tom then walked towards the officers and was arrested. He was cooperative, and both Valenti and Colwell testified that they did not engage in a struggle with him or strike him. Thus, according to Valenti and Colwell's testimony, neither officer was in the backyard, or on the porch, landing or steps behind the house, neither officer entered the house, and neither officer ever had occasion to or did strike Tom.

The officers' testimony is contradicted by the testimony of two neighbors who were observing the events that evening. Steven Chalmers testified that he observed two police officers, one in the alley, and one in the backyard, and that the officer in the backyard told him, "It's all over, you can go back in." App. at 152. Chalmers nevertheless continued observing, and saw two other officers bring Tom off the back steps to the back of his house down into the yard. App. at 154. His impression was that these two officers were bringing Tom out of his house. *Id.* He identified Officers Valenti and Colwell as the two

officers. He testified that Tom appeared to be handcuffed at that time, and that he was walking slowly, and with his head down.

Another neighbor, George Klein, testified as follows regarding what he observed during the second incident:

BY [PLAINTIFF'S ATTORNEY]

Q: And when you heard this glass breaking, what did you do?

A: I went to the front door to see what was going on, and I heard all the glass breaking. It sounded like somebody was demolishing the house. So I yelled in the house to call the police. And then the police came.

Q: Did you see who arrived first or what vehicle arrived first?

A: A car arrived first and then another car. The officers that arrived first went around the back and the one officer went around front, stayed around front, knocking on the door.

Q: You say you saw an officer knocking on the door?

A: Yes.

Q: And you say—how many officers went around back?

A: Two that I know of.

. . . .

Q: And you saw the police go down American Street?

A: Yes.

Q: And you lost sight of them?

A: Yes.

Q: And you inferred that they went—

A: Yes, behind the house.

Q: You didn't actually see them go behind the house, did you?

A: No.

Q: What did you see next?

A: I seen a bunch of shadows in the window, and then—

Q: When you say shadows in the window, in whose window did you see shadows?

A: The Walmsley's

Q: Inside 226 West Fisher Street?

A: Yes.

Q: How many shadows did you see?

A: About two people.

Q: Did you know who they were?
A: No.
Q: Had you seen any of the police officers that were in the front of the house go into the house?
A: No.
Q: Did they?
A: No.
Q: So that the officers in the front never went in?
A: Never went in.
Q: And what room—could you see what room these two shadows were coming from?
A: The living room.
Q: Of 226 West Fisher?
A: Yes.
Q: Did you hear anything going on while you were seeing these two shadows?
A: Just a bunch of glass breaking.
Q: So you still heard glass breaking?
A: Yeah.
Q: What happened after that?
A: And a little while later I seen them come around with Tommy handcuffed.

. . . .

BY THE COURT:

. . . .

Q: And as best you can remember, could you describe [the officers who brought Tom around] for the jury?
A: As best I can remember, the heavyset officer. That's it.
BY [PLAINTIFF'S ATTORNEY]:
Q: Do you recall whether or not this heavyset officer was one of the officers that you saw go behind the house?
A: Yes, he was.

. . . .

Q: And do you recall whether the other officer was the same officer that also went behind the house?
A: Yes, as far as I know.

. . . .

Q: Do you recall, when you saw those two shadows, how long those officers were in the house?
A: About five minutes.

Q: Were you able to see anything except for those shadows in the living room?
A: No.
Q: Do you know where Tom was when you saw those shadows?
A: He was upstairs, you know, furniture breaking upstairs.
    [DEFENDANT'S ATTORNEY]: Objection, your Honor.
    THE COURT: Well, ask him how he knows that.
BY [PLAINTIFF'S ATTORNEY]:
Q: How do you know where Tom was?
A: You could hear the furniture breaking upstairs.
BY THE COURT:
Q: How do you know he was doing it?
A: I don't.
BY [PLAINTIFF'S ATTORNEY]:
Q: At that time you didn't know who was in the house?
A: Right.
Q: And what you saw come from the house were these two officers and Tom?
A: Right.

App. at 197–203.

Tom was next taken into custody by Officers Valenti and Colwell, and placed in the back of a police van. En route to the van, the officers and Tom encountered Police Lt. Augustine Carre. Lt. Carre observed that Tom appeared to have been beaten up, and asked him if he wanted to go to the hospital. The officers told Carre that they had already asked him whether he wanted to go the hospital, and he had said he did not. According to Carre, Tom himself also said he did not want to go to the hospital.

Tom was then taken, in the police van, to a police station about five minutes away. When the officers opened the back of the police van, they found that Tom was unconscious. An attempt to revive him with an ammonia capsule was unsuccessful, and the officers took him to the hospital. Tom was declared dead shortly after arriving at the hospital. His mother, when holding her dead son at the hospital, noticed lumps on his scalp that she testified did not exist

when she had brushed her son's hair earlier in the evening.

### B.

Geraldine Walmsley, Tom's mother, filed this action on August 19, 1987, in her capacity as administratrix of Thomas Walmsley's estate and on her own behalf, against the City of Philadelphia, Gregor Sambor and Kevin Tucker (City Police Commissioners), and Police Officer John Doe and other unknown and unnamed officers. The complaint, which invoked 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988, as well as the first, fourth, fifth, eighth, and fourteenth amendments, alleged essentially three constitutional violations—the excessive use of force, false arrest, and deliberate indifference to medical needs. An amended complaint was filed on September 9, 1987, which added as defendants police officers David Grove, Ernest Colwell, Michael Valenti, and Mark Goldberg, and Police Lt. Augustine Carre. The defendants named, as a third party defendant, the decedent's brother, Robert Walmsley.

The actions against defendants the City of Philadelphia, Gregor Sambor, Kevin Tucker, Mark Goldberg, and David Grove were dismissed by stipulation prior to trial. A trial against defendants Colwell, Valenti, and Carre, and third party defendant Robert Walmsley, commenced on May 16, 1988. On May 24, 1988, after the plaintiff had concluded the presentation of her case, the district court granted the remaining defendants' motion for a directed verdict, dismissing the claims against the defendants and effectively dismissing the third party complaint against Robert Walmsley. The plaintiff filed a notice of appeal on June 20, 1988. We have jurisdiction under 28 U.S.C. § 1291.

### II.

The issue before us on appeal is whether the district court erred when it dismissed the plaintiff's claims against Colwell, Valenti, and Carre by way of directed verdict.

In reviewing a directed verdict, we are required to utilize the same standard initially applied by the district court. When deciding a motion for a directed verdict, a court must consider the evidence in the light most favorable to the nonmoving party, and deny a defendant's motion "if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability." *Flynn v. Bass Bros. Enters. Inc.*, 744 F.2d 978, 983 (3d Cir. 1984) (quoting *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174, 178 (3d Cir.1976)). However, a district court's grant of a directed verdict should be upheld if "without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." *Id.* (quoting *Brady v. Southern Ry.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)).

The plaintiff here has made several claims against the defendants. First, she claims that Officers Colwell and Valenti used excessive force when arresting Thomas Walmsley, depriving him of his civil rights. *See Howell v. Cataldi*, 464 F.2d 272, 282 (3d Cir.1972) (use of force by police which exceeds that which is reasonable and necessary, and violates universal standards of decency gives rise to liability for constitutional deprivation under section 1983). Second, she contends that Thomas Walmsley's arrest by officers Colwell and Valenti without a warrant was without probable cause and was therefore a deprivation of his civil rights. *See Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir.1978) (arrest without probable cause is a constitutional violation actionable under section 1983). Finally, she contends that Colwell, Valenti and Carre were deliberately indifferent to Thomas Walmsley's serious medical needs, and therefore deprived him of his civil rights. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deliberate indifference to serious medical needs of person in state custody is a violation of person's eighth amendment right actionable under section 1983).[3]

---

**3.** The plaintiff's complaint did allege additional claims based on violations of both the constitution and Pennsylvania law, but she does not assert on appeal that the district court erroneously dismissed those claims.

■ We find that the district court properly granted a directed verdict as to several of these claims. First, the district court properly concluded that the plaintiff did not present sufficient evidence to go forward with her claim that Valenti and Colwell falsely arrested Thomas Walmsley. The police were contacted by Thomas Walmsley's mother, who informed them of his threat to "wreck" his brother's house, and get a gun and shoot anybody coming to the house. Neighbors in the area also called the police to complain about the noise and the disturbance. Given this information, we find that the police clearly had probable cause to arrest Thomas Walmsley.

■ Second, we find that the district court properly directed a verdict on the plaintiff's claim that Lt. Carre was deliberately indifferent to Thomas Walmsley's serious medical need. The only evidence to support this claim was Lt. Carre's testimony that he observed Thomas Walmsley before he was placed in the police van and that he looked as if he had been beaten. There is no indication, however, that Carre had any inkling that Thomas Walmsley may have suffered serious head injuries, or had injuries more severe than might be expected from the fistfight earlier that morning. Given these facts, we do not think a reasonable jury could conclude that Carre was deliberately indifferent to a serious medical need.[4]

We find that the district court erred, however, in directing a verdict on the plaintiff's claims that Officers Colwell and Valenti used excessive force when arresting Thomas Walmsley, and were deliberately indifferent to Thomas Walmsley's serious medical needs.

■ The plaintiff presented sufficient evidence from which a reasonable jury could infer that Colwell and Valenti inflicted the injuries which caused Thomas Walmsley's death. Although Thomas Walmsley did have a fistfight with his brother early that morning, several witnesses testified that his head did not bang

into a blunt object during the fight, and that Robert's punches struck Tom's face, not his head. These descriptions, when combined with the expert testimony describing Tom's injuries and the events which would likely cause such injuries, could lead a jury reasonably to conclude that the injuries causing Tom's death were not inflicted during the fight with his brother.

We also conclude that the plaintiff presented sufficient circumstantial evidence to permit the jury reasonably to conclude that Tom was involved in a confrontation with Officers Colwell and Valenti in which he received injuries that could have caused his death. Most significantly on that point, we note that Colwell's and Valenti's accounts of the incidents that preceded Tom's arrest are contradicted by the testimony of two of the plaintiff's witnesses. Officers Colwell and Valenti testified that they never entered the house. One of the plaintiff's witnesses, a neighbor, testified that he observed the silhouettes of two persons in the house through the shade in the house's window at a time when, according to the officers' testimony, only Tom was in the house. Another neighbor testified that he observed two police officers on the back porch of the house, apparently bringing Tom out of the house. Viewed in the light most favorably to the plaintiff, this testimony is sufficient to allow a jury to discredit the testimony of the officers regarding the incidents immediately prior to Tom's arrest including their testimony that they never struck the decedent.

If the officers did strike Thomas Walmsley, the plaintiff must still prove that the force they used was excessive. Given the nature of the injuries and the fact that if force was used, the officers lied and covered up to conceal the use of force, we find that a jury could also reasonably infer that the officers' use of force was excessive, and violated Thomas Walmsley's civil rights.

■ We also find that the district court erred when it directed a verdict on the

4. We have, of course, discounted Carre's testimony that he asked Thomas Walmsley whether

he wanted to be taken to the hospital.

plaintiff's claim that Valenti and Colwell were deliberately indifferent to Thomas Walmsley's serious medical needs. If a jury concludes that Colwell and Valenti struck Thomas Walmsley several times about the head with a blunt instrument, it also could reasonably infer that the officers should have known he would require immediate medical attention. Colwell and Valenti's failure to act to provide such attention would amount to a civil rights violation.

### III.

For the reasons expressed in this opinion, we will reverse the district court's grant of a directed verdict on the plaintiff's claims that defendants Colwell and Valenti used excessive force when arresting Thomas Walmsley and were deliberately indifferent to his serious medical condition, in violation of his civil rights. We affirm the remainder of the district court's order.

Costs taxed against the appellees.

ALDISERT, Circuit Judge, dissenting.

I would affirm the judgment for the reasons stated by the district court. Accordingly, I dissent.

The trial judge was convinced that before Thomas Walmsley came under police custody he had been in a knock-down, drag-out brawl that started on the second floor, bounced down to the first floor, and ended outside the house; that the "brawl in the bedroom ended up on the floor, with the decedent lying on his back on the floor," app. at 576; that "it took three of the persons present to try to restrain and hold the decedent to the floor," id.; that "all three of those men, apparently, were necessary to push the decedent out of the front door violently," id. at 577; that "Thomas came out and either slid or fell down one of those railways and landed on his backside as he came out the door," id. at 578; that "they were trading punches," id. at 578; and "there is testimony that Thomas and Robert both hit the wall twice," id. at 579. The trial judge noted that there was testimony that the multiple blunt injuries to the head could have been caused by a fall, "that a wall or stairs could cause these types of injuries." id. at 584.

There was no direct evidence that Walmsley had hit his head in the fray, but there was sufficient circumstantial evidence for the trial judge to draw the permissible inference that Walmsley had done so.

Although the burden of proof in this case always rested with the appellant, by brief and oral argument appellant seemed to proceed as if the defendants had the burden. The City did not have to prove that the officers did not assault Walmsley. Rather, the burden was on the plaintiff to show that they did.

The City needed only to show that it was possible that Walmsley was injured in the fight. This showing was made. It was sufficient to rebut plaintiff's claim that the injuries sustained could only have been caused by a police beating. In the face of that rebuttal, the plaintiff had to come forward with evidence sufficient to allow a jury to infer that a police beating occurred. The mere fact of injury was not enough. The trial judge found that plaintiff did not meet this burden.

I concede that at oral argument the City wasted valuable time in arguing (1) (as the majority opinion indicates) a totally unnecessary point—that there was insufficient evidence to draw the inference that the police were in the house prior to the arrest, and (2) that injuries to Walmsley's head "could have occurred before the fight even started, up to 48 hours before." Oral Argument Transcript at 38.

The relevant evidence supported the City's position. The uncontroverted narrative or historical facts are that the decedent had been in a brawl, that he had fought and traded punches with several men before being taken into police custody. There was no direct evidence that police used blunt instruments on him. There could be no permissible inference that the Philadelphia police used billy clubs on him. There was no proof that head-bashing with clubs was a long-standing police practice. You can neither assume nor draw a reasonable inference that such police brutality always takes place or took place here. From narrative fact "A," that the police

took him into custody, you may not infer fact "B" that a police beating took place. For a passage of narrative fact to inferred fact to be valid, it must be according to a reasonable probability that the conclusion flows from the evidentiary datum because of past experience in human affairs.

Clearly, the teachings of *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir.1980), apply:

> When a trial court grants a directed verdict in a circumstantial evidence case, the court makes a legal determination that the narrative or historical matters in evidence allow no permissible inference of the ultimate fact urged by the opposing party. It decides that no reasonable person could reach the suggested conclusion on the basis of the hard evidence without resorting to guesswork or conjecture. To permit a jury to draw an inference of the ultimate fact under these circumstances is to substitute the experience of logical probability for what the courts describe as "mere speculation."

Appellant relied heavily on the testimony that when the mother and sister brushed the decedent's hair back from his face after the fight ended, they saw no lumps on the head. This is not probative evidence in a court of law. The witnesses simply said they did not see lumps. They did not say that they looked for lumps and had a reason for so doing. From this the appellant asks to draw an inference that there were no bruises on the decedent's head before he entered police custody. Such an inference may not be drawn here. It is an example of what logicians describe as the "Fallacy of Drawing an Affirmative Conclusion from a Negative Premise." *See* I Copi, *Introduction to Logic* 221 (7th ed. 1986). *See also* D. Fischer, *Historians' Fallacies* 47 (1970) ("The fallacy of negative proof is an attempt to sustain a factual proposition merely by negative evidence.") This type of reasoning is unacceptable because of the difficulty in sustaining a factual proposition merely by negative evidence. When an advocate determines that there is no evidence that B (bumps on the head) is the case; he or she is attempting to affirm or assume that non-B is the case. But all that

is affirmed or assumed is that the advocate has found no *evidence* of non-B. The correct method of proceeding is to find affirmative evidence of non-B. This may be difficult, but it is absolutely necessary if logical order is to be preserved. To prove a negative is sometimes an impossible task. Not knowing that something exists is simply not knowing. Similarly, not knowing that Walmsley hit his head during the fight with his brother does not imply that he did or did not hit his head.

Alice's experience with the White Knight comes to mind:

> "I see nobody on the road," said Alice. "I only wish I had such eyes," the King remarked in a fretful tone. "To be able to see Nobody! And at that distance!"

*The Complete Works of Lewis Carroll,* Modern Library ed. (New York, n.d.), p. 223.