Ernest **HILL**, (AKA) Antoine Hill, **Plaintiff**,

v.

Jeffrey **ALGOR**, individually and as a New Jersey State Police Officer, David Henry. Meyer, individually and as a New Jersey State Police Officer, Robert Kwap, individually and as a New Jersey State Police Officer, Stephen Makuka, individually and as a New Jersey State Police Officer, and John Does (1 through 6 individually and as New Jersey State Police Officers), **Defendants**.

Civil Action No. 97–205 (SSB).

United States District Court,
D. New Jersey.

Jan. 18, 2000.

I. Dominic Simeone, Law Offices of I. Dominic Simeone, Cherry Hill, NJ, for Plaintiff.

John C. Connell, Archer & Greiner, Haddonfield, NJ, for Defendants.

## OPINION ON MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Presently before this Court is the motion of defendants Trooper David Henry Meyer ("Meyer"), Trooper Robert Kwap ("Kwap") and Trooper Stephen Makuka ("Makuka") for summary judgment pursuant to Fed.R.Civ.P. 56.[1]

1. Defendant Jeffrey Algor ("Algor") joined in the defendants' summary judgment motion

## I. FACTS AND PROCEDURAL BACK-GROUND

This 42 U.S.C. § 1983 action arises out of events occurring in the aftermath of a January 19, 1996 shootout between New Jersey state troopers and drug suspects inside the Happy Dragon Chinese Restaurant located at Twenty–Eighth and Mickle Streets in Camden, New Jersey. On this night, troopers Algor, Meyer ("Meyer"), Roy Baker ("Baker"), and Sgt. Stewart Whiteman ("Whitman"), pursuant to the Camden Initiative,[2] were on patrol in the Camden area. They responded to a report of drug activity at the restaurant. As a result of the gunfire which ensued, Baker was severely wounded, and a drug suspect was killed.

While these events were unfolding, plaintiff Ernest Hill ("Hill") was walking along Twenty–Eighth Street to the bus stop to catch a bus to Pennsauken. As he walked, Hill heard gunfire. Hill continued toward the bus stop but paused directly across the street from the restaurant, noting the presence of state troopers. Hill also noticed an African–American male lying in the entrance to the restaurant. While Hill could not positively identify the male, he believed the man to be his friend Moses Clary. Hill yelled to the troopers to call an ambulance. The parties dispute the events which followed Hill's arrival on the scene, including both Hill's and the troopers' actions. Ultimately, Hill was arrested for obstruction of justice. Algor and Meyer were the officers who arrested Hill.

After his arrest, Hill was transported to the Camden Police Administration Building. Shortly thereafter, Hill was transported to the State Police Barracks in Bellmawr, New Jersey ("the Barracks"). On this night, Kwap was the acting shift

supervisor of the Barracks. At the Barracks, Hill was placed in a holding cell, where, handcuffed to a bench, he remained from 11:45 p.m. until approximately 2:30 a.m. During this time, Hill claims that he was beaten by a group of state troopers. Hill does not know the identities of these troopers.

At around 2:45 a.m., Investigator Charles Bentham ("Bentham") entered Hill's holding cell to move him to another room where his official statement would be taken. Upon entering the cell, Bentham noticed some blood on Hill's clothing, hands, and head near the hairline. Bentham took Hill to a restroom to wash the blood from his face and hands.

In the interrogation room Bentham and Makuka asked Hill questions and took his statement, which process did not end until approximately 4:30 a.m. Makuka, who was off-duty on this night, was summoned to the Barracks to question Hill concerning the circumstances surrounding the shooting of Trooper Baker.

Ultimately, Hill was charged with obstruction of justice in violation of N.J.S.A. 2C:29–1 and released from the Barracks between 4:30 a.m. and 5:30 a.m. on January 20, 1996. After his release, Hill sought treatment at Cooper Medical Center. At the hospital, Hill received stitches in his head. In addition, Hill complains of spinal and knee injuries as a result of his assault.

On January 17, 1997, Hill filed a complaint against the State of New Jersey, the New Jersey State Police Department, and John Does 1–6 individually and as state police officers. On October 10, 1997, the Court granted Hill's motion to amend his complaint, and on October 2, 1997, Hill filed an amended complaint naming Algor as a defendant. On October 14, 1997, the

with respect to Count Three of the amended complaint alleging violation of 42 U.S.C. § 1983 for failure to provide medical care. As Hill has decided not to proceed against Algor with this claim, the claim will be dismissed.

2. The Camden Initiative involved the patrolling of the streets of Camden by New Jersey State Troopers affiliated with the Tactical Emergency and Mission Specialist, or TEAMS, Units. The Initiative was aimed at decreasing illegal drug activities in Camden.

Court dismissed with prejudice all federal and state claims against the State of New Jersey and the New Jersey State Police Department. On February 23, 1999, Algor filed a motion seeking summary judgment on all claims. In an Opinion and Order dated June 1, 1999 ("the June Opinion"), the Court granted Algor's motion for summary judgment as to the following claims:

(1) First Cause of Action (42 U.S.C. § 1983): that part which alleges a violation of Hill's Fourth and Fourteenth Amendment right to equal protection; and

(2) Second Cause of Action: Conspiracy based upon discriminatory animus under 42. U.S.C. § 1985(3).

(Order dated June 1, 1999.) In addition, pursuant to Hill's decision not to pursue against Algor the following claims, the Court dismissed these claims with prejudice:

(1) First Cause of Action (42 U.S.C. § 1983): those parts which allege a violation of Hill's:

　i. Eighth Amendment right to protection from cruel and unusual punishment;

　ii. Sixth Amendment right to be informed of the nature and cause of the accusations against him;

　iii. Fourth Amendment right to be protected against punishment disproportionate to any crime;

(2) Third Cause of Action (42 U.S.C. § 1983);

(3) Fourth Cause of Action (42 U.S.C. § 1983);

(4) Sixth Cause of Action (Negligence). Order dated June 1, 1999.

Thus, the remaining claims against Algor which survived summary judgment and may proceed to trial include:

(1) First Cause of Action (42 U.S.C. § 1983): that part alleging violation of Hill's Fourth and Fourteenth Amendment right to protection from false arrest and excessive force;

(2) Fifth Cause of Action alleging common law assault; and

(3) Ninth Cause of Action alleging common law false arrest.

On March 22, 1999, the Court granted Hill's motion to amend his complaint for a second time, and the following day Hill filed a second amended complaint. The second amended complaint adds Meyer, Kwap, Makuka, and John Does 1–6 as defendants. It alleges that defendants violated 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3). It also contains state law causes of action for assault, negligence, respondeat superior, malicious prosecution, and false arrest. On October 8, 1999 defendants Meyer, Kwap, and Makuka filed the summary judgment motion that is presently before the Court.[3]

## II.　DISCUSSION

### A.　JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

---

**3.** Defendants Meyer, Kwap, and Makuka moved for summary judgment with regard to all of the causes of action alleged against them. In his opposition brief, Hill agreed not to pursue the following claims against the defendants: (1) those parts of the first cause of action (42 U.S.C. § 1983) which allege a violation of Hill's Fourth and Fourteenth Amendment right to equal protection of the law, his Sixth Amendment right to be informed of the nature and cause of the accusations against him, and his Eighth Amendment right to protection from cruel and unusual punishment; (2) the second cause of action (42 U.S.C. § 1985(3)); (3) the third cause of

action (42 U.S.C. § 1983) as to defendant Meyer; (4) the fourth cause of action (42 U.S.C. § 1983) as to defendant Meyer; (5) the sixth cause of action (negligence); and (6) the seventh cause of action (respondeat superior) as to defendant Makuka.

Hill continues to assert claims against John Does 1–6. As Hill has failed to come forward with the identity of these individuals, the Court will dismiss these claims with prejudice. *See e.g., Veteto v. Miller,* 829 F.Supp. 1486, 1497 (M.D.Pa.1992); *Rodriguez v. City of Passaic,* 730 F.Supp. 1314, 1319 n. 7 (D.N.J.1990).

## B. SUMMARY JUDGMENT STANDARD

The standard for granting a motion for summary judgment is a stringent one, but it is not insurmountable. Fed.R.Civ.P. 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.' " *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or . . . vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### FEDERAL CLAIMS

## C. COUNT ONE: VIOLATION OF 42 U.S.C. § 1983

In count one of his second amended complaint, Hill alleges that defendants violated 42 U.S.C. § 1983 by infringing on his Fourth and Fourteenth Amendment rights to protection from false arrest and excessive force. *See* Second Am. Compl. ¶ 20.

42 U.S.C. § 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

This statute "is not itself a source of substantive rights, but a method for vindicating parts of the United States Constitution and federal statutes that it describes." *Alexander v. Whitman*, 114 F.3d 1392, 1400 (3d Cir.), *cert. denied*, 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

### 1. False Arrest

An arrest that is made without probable cause violates the Fourth Amendment. *See Skevofilax v. Quigley*, 586 F.Supp. 532, 545 (D.N.J.1984). The Third Circuit has defined probable cause as follows:

> Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evi-

dence sufficient to prove guilt beyond a reasonable doubt. Rather probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.

*Id.* 71 F.3d 480, 482–83.

Hill was charged with obstruction of justice pursuant to N.J.S.A. § 2C:29–1, which states in pertinent part:

A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of intimidation, by force, violence or physical interference or obstacle, or by means of any independently unlawful act.

N.J.S.A. § 2C:29–1. Hill alleges that Meyer and Algor arrested him for obstruction of justice without probable cause, effectuating a false arrest.

■ In the June Opinion, the Court denied Algor's motion for summary judgment as to Hill's false arrest claim, noting significant differences in the accounts given by Hill and defendants Algor and Meyer regarding the events leading up to Hill's arrest. *See* Op. and Order dated June 1, 1999. Specifically, the Court noted the following matters in dispute:

1. Algor and Meyers both testified in their respective depositions that "Hill made threatening movements while in proximity to the crime scene. These movements included reaching down into his waistband and failing to retreat when instructed to do so by the officers on the scene." (citations omitted);

2. Hill testified in his deposition that he was "moving" but "does not address the troopers' allegation that Hill repeatedly moved his hands toward his waistband. Hill attempts to explain away this allegation in his opposition brief by arguing that 'the allegation that Mr. Hill moved his arms about is a completely natural action for someone requesting medical assistance.'" (citation omitted).

The Court went on to explain why summary judgment was not proper:

While it is clear that Hill failed to retreat when asked to do so—either once or multiple times—it is unclear whether Hill responded to the officers' requests by moving closer to the crime scene or simply by remaining stationary. This uncertainty is the result of confusion regarding what Hill meant by his admission that he was "moving"; he could have been moving just his arms as he yelled for someone to call an ambulance and/or he could have been moving his feet. It is also unclear whether Hill reached down to his waistband, as Algor and Meyer allege, or whether Hill simply flailed his arms about as part of the emotional outburst he was purportedly having.

Op. dated June 1, 1999 at 9.

Meyer, who was added as a defendant in Hill's second amended complaint, now seeks summary judgment as to the false arrest claim, asserting identical arguments as those launched by Algor in his summary judgment motion, namely that there existed probable cause to arrest Hill. Thus, for the same reasons stated in the June Opinion denying Algor's motion for summary judgment, Meyer's motion as to Hill's false arrest claim also will be denied.[4]

4. Meyer argues that he enjoys qualified immunity from Hill's § 1983 false arrest claim. As discussed throughout the text of the opinion, the facts surrounding Hill's arrest remain in dispute. Thus, the Court cannot resolve Meyer's qualified immunity defense as a matter of law. *See infra* part 2.a.

## 2. Excessive Force

### a. Defendant Meyer

Hill alleges that defendant Meyer used excessive force in effectuating his arrest. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Relevant to this inquiry is the status of the plaintiff at the time of the alleged violation. In *Graham,* the Supreme Court made explicit that the Fourth Amendment governs excessive force claims arising out of an arrest or investigatory stop. 490 U.S. at 395, 109 S.Ct. 1865. As Hill's excessive force claim against Meyer arises from events occurring during his arrest, a Fourth Amendment analysis is appropriate.

 Under the Fourth Amendment, whether an officer used excessive force is assessed by the "objective reasonableness" of that officer's conduct. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Whether the force used to effectuate an arrest is reasonable depends upon "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

 In the June Opinion, the Court denied Algor's motion for summary judgment on the excessive force claim, finding genuine issues of material fact as to "the actual events leading up to Hill's arrest, the extent of Hill's resistance to arrest, and the amount of force that Algor used in arresting Hill." (Op. dated June 1, 1999 at 12.) For the same reasons expressed in this opinion, Meyer's motion for summary judgment likewise fails.

As discussed in Part C.1 above, a genuine issue of material fact exists regarding Hill's conduct and physical actions prior to his arrest. Therefore, it is unclear whether Hill posed an immediate threat to the safety of the officers on the scene and to others.

Moreover, as outlined in the June Opinion, recreated below, a genuine dispute exists concerning whether Hill resisted arrest:

Q: You [Algor] and Trooper Meyer did use physical force to apprehend my client; is that correct?

A: Correct, sir.

B: Basically your bare hands?

A: Yes, sir.

. . . . .

I tried to grab and tried to restrain [Hill] to get his hands behind his back.

A: Where did you grab him?

A: I grabbed him on his arm while he was flailing. His left arm was to Trooper Meyer and the right was toward my side. Trooper Meyer was able to get to the left and I brought it down him, behind at which time I came around to grab the left and employed a wrist lock technique to get his arm. I took my cuffs out, put the cuffs on and tried to get him to come down to the ground, and he was still flailing around, and we were able to like trip him and him get him to the ground at that point. So he went down and he was laying face down. I had his left hand behind his back and that's when the arm and the legs kept kicking and the right arm was trying to punch at us. We tried to grab his right arm. His right arm would go back inside so we couldn't get his wrist to get it

back, twisted behind his back to finish the handcuffing procedure.

Q: Are you saying that you lost your grip on his right arm?

A: No, sir. He kept pulling away.

Q: So you never lost your grip .on his right arm?

A: I never had a grip of his right arm.

Q: Eventually you subdued him and he was handcuffed?

A: After the blast of OC was administered by Trooper Meyer he was still fighting, but it seemed like it took some of the fight out of him and we were able to finally get the right arm behind the back and finish up the handcuffing.

Op. dated June 1, 1999 at 10–11 (citing Algor's Summ. J. Br., Attach. 3 at 163–165). Hill's deposition testimony contradicts Algor's statements that Hill kicked and punched at the officers while they were attempting to arrest him:

Q: Did you resist being arrested?

A: No.

Q: Did you put up a fight with the police?

A: No.

Q: Did you raise your hands and try to swing at the police?

A: No.

Q: Did you ever try to kick any—or strike that. Did you ever try to kick a police officer at the scene while he was attempting to apprehend you?

A: No.

Q: Did you ever punch a police officer at the scene?

A: No.

Q: Did you ever pull away from any of the officers who were attempting to handcuff you?

A: No.

*Id.* (citing Pl.'s [Feb. 23, 1999] Opp'n Br., Ex. A at 118). While Meyer's testimony serves to corroborate Algor's statements,[5] it fails to change the Court's earlier finding that there is a genuine issue of material fact regarding Hill's resistance to arrest.

Finally, fact issues exist regarding the extent of force the troopers used on Hill. Hill claims that one officer hit his face with a gun and that while on the ground he was kicked by two officers. *See* Pl.'s Ex. E. at 112, 119. Meyer denies that he or Algor struck Hill in the face. *See id.* at 107. However, Meyer does admit to using pepper spray on Hill in order to effectuate his arrest. *See id.* at 105. Therefore, genuine issues exist as to the events leading up to Hill's arrest, the degree of Hill's resistance to arrest, and the extent of Meyer's use of force. *See Groman v. Twp. of Manalapan,* 47 F.3d 628, 634 (3rd Cir.1995) (reversing summary judgment on excessive force claim where testimonies by plaintiff and officer differed) (citing *Frohmader v. Wayne,* 958 F.2d 1024, 1025–26 (10th Cir. 1992)).

 Notwithstanding these disputed facts, Meyer argues that he is entitled to

---

5. Meyer's deposition testimony, like Algor's account, asserts that Hill actively resisted arrest:

Q: You didn't have any problem getting Mr. Hill to the ground?

A: No, sir.

Q: Once you got Mr. Hill to the ground, what happened next?

A: Again, I tried to manipulate his arm into a handcuffing position.

Q: Which arm?

A: I don't recall. I honestly don't remember.

Q: Were you on top of Mr. Hill?

A: Yes, I was.

Q: He was face down on the ground?

A: Yes, he was.

. . . .

Q: Okay. Then what?

A: At that time, he started kicking, and trying to push up, and roll, and stiffening his arm, and he wouldn't allow us to handcuff him, basically.

Q: What happened next?

A: At that time, I made the decision to use Doc (pepper) spray.

Pl.'s Ex. E at 104–05.

qualified immunity. To determine whether a police officer may enjoy qualified immunity, a court must engage in a two-step analysis:

> First, the court must determine whether plaintiffs have established a constitutional claim. The court must then determine whether the officer's conduct was objectively reasonable given the legal rules clearly established at that time. Only when the contours of a right are sufficiently clear so that a reasonable officer would understand that his conduct violates that right will a right be considered clearly established.

*Malignaggi v. County of Gloucester*, 855 F.Supp. 74, 79 (D.N.J.1994) (citations omitted). Meyer argues that the applicability of qualified immunity presents a question of law for the Court to decide while Hill insists that the Court treat the question as one of fact. *See* Defs.' Br. at 37; Pl.'s Opp'n Br. at 57.

■ Generally, the applicability of qualified immunity is a question of law. *See Sherwood v. Mulvihill*, 113 F.3d 396, 401 n. 4 (3d Cir.1997). However, where factual issues relevant to the determination of qualified immunity are in dispute, the Court cannot resolve the matter as a question of law. *See Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir.1995). The Court has already determined that there is uncertainty regarding the events leading up to Hill's arrest, the extent of Hill's resistance to arrest, and the amount of force that Meyer used in arresting Hill. Because these facts remain in dispute, the Court cannot determine as a matter of law whether Meyer acted in an objectively reasonable way when he allegedly used force to arrest Hill. Therefore, the Court will deny Meyer's motion for summary judgment with regard to the excessive force portion of Hill's 42 U.S.C. § 1983 claim.

**b. *Makuka***

Hill alleges that while detained at the Barracks awaiting release defendant Makuka, in addition to others, subjected him to excessive force.[6] Specifically, Hill alleges that while handcuffed to a bench in his holding cell, state troopers came in and hit him "with their flashlights and walkie-talkies." Pl.'s Ex. A. at 131.

■ Under *Graham*, this Court must "identify the specific constitutional right allegedly infringed by" the unprovoked assault occurring during Hill's custody at the Barracks. 490 U.S. at 394, 109 S.Ct. 1865. Hill argues that he still qualified as an arrestee protected by the Fourth Amendment, whereas Makuka contends Hill was a pretrial detainee, whose rights are secured by the Fourteenth Amendment's guarantee of Due Process. The standard for § 1983 excessive force claims governed by the Fourteenth Amendment—that the officer's conduct "shock the conscience"— is much higher than the "objective reasonableness" standard imposed by the Fourth Amendment.

As stated previously, the Supreme Court in *Graham* held that § 1983 excessive force claims arising out of an arrest, investigatory stop or other " 'seizure' of a free person" are to be analyzed under the Fourth Amendment. 490 U.S. at 395, 109 S.Ct. 1865. The Supreme Court defined "seizure" for Fourth Amendment purposes as a government actor's use of "physical force or show of authority [which] restrain[s] the liberty of a citizen." *Id.* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 (citation omitted). Noting that the Due Process Clause protects pretrial detainees against the use of excessive force amounting to punishment, *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–539, 99 S.Ct. 1861, 60 L.Ed.2d 447), the Supreme Court acknowledged, "Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with

---

**6.** In count one of the complaint, Hill alleges that defendant Kwap subjected him to excessive force. Hill has decided not to pursue this claim and thus, this portion of count one against Kwap will be dismissed.

protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today." *Id.* Thus, the Supreme Court left unanswered (1) the particular moment in time at which arrest or seizure ends and pretrial detention begins; and (2) whether the Fourth Amendment applies beyond arrest into the period of pretrial detention.

With regard to the line of demarcation separating arrest and pretrial detention, the Supreme Court, prior to *Graham,* has defined "pretrial detainee" as a person who has been charged but not yet tried of a crime. *Bell v. Wolfish,* 441 U.S. 520, 522, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Bell,* the Supreme Court held that conditions of pretrial detention must comport with Due Process, reasoning:

> A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. *He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'* Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.

*Id.* at 536–37, 99 S.Ct. 1861 (emphasis added). Thus, it is clear from *Bell* that one who remains in detention after formal charge and while awaiting trial is a pretrial detainee subject to Due Process protection. The question now plaguing the courts of appeals, however, concerns whether the starting point of pretrial detention, as determined by the termination of a Fourth Amendment "seizure", precedes post-charge detention as acknowledged in *Bell.*[7]

Recognizing the difficulty in resolving this issue, the Third Circuit has stated, "Although the Supreme Court has repeatedly defined when a Fourth Amendment seizure occurs or begins, it has not determined when that seizure ends and Fourth Amendment protections no longer apply. We also have left open that question." *Torres v. McLaughlin,* 163 F.3d 169, 174 (3rd Cir.1998).[8] Moreover, while several of the other courts of appeals have rendered decisions on this issue, clearly lacking is a consensus. At least three circuits have declined to extend the Fourth Amendment beyond the initial arrest or seizure. *Riley v. Dorton,* 115 F.3d 1159, 1163 (4th Cir.1997) (holding Fourth Amendment does not apply to post-arrest conditions of custody); *Brothers v. Klevenhagen,* 28 F.3d 452, 456 (5th Cir.1994) (finding plaintiff constituted pretrial detainee governed by Due Process standard where he had been arrested, placed into police custody and arresting officer had transferred him to jail cell); *Titran v. Ackman,* 893 F.2d 145, 147 (7th Cir.1990) (assuming that "presence in the jail and the completion of the booking marked the line between 'arrest' and 'detention' ") and *Wilkins v. May,* 872 F.2d 190, 192 (7th Cir.1989) (holding Due Process standard governs excessive force claims predicated on events occurring during the period between arrest and charge). Disagreeing with these courts, the Ninth and Tenth Circuits have applied the Fourth Amendment to post-arrest, pre-arraignment custody obtained without a warrant. *See*

**7.** In *Torres v. McLaughlin,* the Third Circuit conclude[d] that the limits of Fourth Amendment protection relate to the boundary between arrest and pretrial detention but further noted that " '[w]here the seizure ends and pre-trial detention begins is a difficult question.' " 163 F.3d 169, 174 (3rd Cir.1998) (quoting *Johnstone,* 107 F.3d at 205, 207 (3rd Cir.1997)).

**8.** The Third Circuit also has noted that the Supreme Court's decision in *Graham* "implicitly held that an arrest is a continuing event that does not end as soon as a suspect is first restrained." *United States v. Johnstone,* 107 F.3d 200, 205 (3rd Cir.1997) (interpreting *Graham* ).

*Pierce v. Multnomah Co.*, 76 F.3d 1032, 1043 (9th Cir.) ("[T]he Fourth Amendment sets the applicable constitutional limitation on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest."); *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir.1991) (overruled on other grounds). In line with the Ninth and Tenth Circuits, the Second Circuit has concluded, "the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned, or formally charged, and remains in the custody ... of the arresting officer." *Powell v. Gardner,* 891 F.2d 1039, 1043 (2nd Cir.1989).

The Ninth and Tenth Circuits in *Pierce*[9] and *Austin,*[10] respectively, held that the Fourth Amendment governs § 1983 claims alleging use of excessive force during a person's post-arrest, warrantless detention awaiting arraignment or determination of probable cause.[11] In reaching this conclusion, both courts sought guidance from case law addressing the constitutional limits of the duration or legality of post-arrest custody. *Pierce,* 76 F.3d at 1043; *Austin,* 945 F.2d at 1160 (overruled on other grounds).[12] Noting that the constitutionality of prolonged detention is assessed under the standard of the Fourth Amendment, the Ninth and Tenth Circuits concluded the Fourth Amendment also must apply to determine the condition of such custody. *Pierce,* 76 F.3d at 1043; *Austin,* 945 F.2d at 1160 (overruled on other grounds).

 This Court agrees with the Ninth and Tenth Circuits that a person continues to be an arrestee subject to Fourth Amendment protection through the period of post-arrest but prearraignment detention. Stated differently, this Court declines to extend pretrial detention beyond the circumstances in *Bell*, concluding that such detention does not begin until an arrestee is at least formally charged and his release or continued detainment is determined. This conclusion logically follows from the line of cases addressing extended warrantless detention after arrest. *See supra* n. 12. In addition, defining pretrial

9. In *Pierce*, plaintiff brought excessive force claims against two officers, alleging that they assaulted her during her detention at the county detention center. Suspected of attempting to board a train without remitting payment of fare, plaintiff was stopped and questioned by the fare inspector. As plaintiff could produce no identification, the inspector called the police to do an identification report. When the officer arrived, plaintiff falsely told him that she had no arrest record. Upon learning that plaintiff did in fact have a record, the officer took plaintiff into custody. Thereafter, plaintiff was taken to the county detention center where she was photographed, fingerprinted, and placed in a cell. It was during plaintiff's four hour detention at the center that the events forming the basis of her claims occurred. 76 F.3d at 1036.

10. The plaintiffs in *Austin* asserted claims against U.S. Customs officials alleging use of excessive force during their detention at the port of entry office. Plaintiffs were taken into custody and detained at the office after marijuana was found in their automobile. Allegedly, while detained at the office, plaintiffs were assaulted on several occasions, render-

ing one of the plaintiffs unconscious. In addition, the officers denied plaintiffs water and use of the rest room. The next day, plaintiffs were released. Although cited by a state trooper for marijuana possession, no federal charges were brought against plaintiffs. 945 F.2d at 1157.

11. While the Ninth Circuit focused on the release or continued custody of the person based upon probable cause, *Pierce* 76 F.3d at 1043, the Tenth Circuit suggested that the Fourth Amendment standard might terminate when the arrestee is formally charged. *Austin,* 945 F.2d at 1160 (overruled on other grounds).

12. The courts cited to *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (concerning reasonableness of time period following arrest within which probable cause determination is made) and *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (holding that "Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest").

detention as beginning with formal charge or initial presentment serves practical purposes. It creates a bright line, thereby affording the courts and law enforcement with much needed clarity as to the precise constitutional standard governing police conduct.[13] As Hill's assault at the Barracks occurred before he was formally charged or taken before a judicial officer, this Court holds that Hill was an arrestee whose condition of custody is governed by the Fourth Amendment's "objective reasonableness" standard.[14]

Moreover, the Court notes that an unprovoked assault, if proved by Hill, would constitute excessive force under both the Fourth Amendment and Due Process standards in that it clearly is "objectively unreasonable" conduct that is "shocking to the conscience." Thus, were Hill considered to be a pretrial detainee, the record would support a finding that he suffered excessive force in violation of his Fourteenth Amendment right to Due Process.

 The next issue for the Court's attention concerns whether sufficient evidence exists for a jury to find that Makuka participated in Hill's assault. Hill alleges that state troopers came into his cell and without provocation began beating him with their flashlights and walkie-talkies. Hill concedes, however, that he cannot identify any of his attackers, because he "put [his] head down:"

Q: So now you get into the [Bellmawr] station and they take you in a room and they handcuff you?

A: Yes.

Q: To what?

A: A bench.

. . . . .

Q: On either side of you?

A: No. The bench is—it was a little bench. It was like a wall. It was a wall on both sides of the bench. It wasn't—it was close. The wall wasn't far away, it was close, and I was handcuffed from each wall, and the door just kept opening up and they was coming in and hitting me with their flashlight and walkie-talkies.

Q: To what were you handcuffed on the wall?

A: To a little round metal thing.

Q: Who came in hitting you?

A: State troopers.

Q: Do you know their identity?

A: No. I put my head down. That's all I could do.

Q: Again, let me direct your attention to the officer who's sitting at the same table across from you. Was this any one of the officers who struck you that night at the Bellmawr Barracks?

A: I put my head down.

Q: So you wouldn't know whether or not he was; is that correct?

A: Yes.

Q: Yes?

A: I wouldn't know.

Pl.'s Ex. A at 130–131. In light of Hill's inability to identify the assaulting officers, Makuka insists that no reasonable jury could find by a preponderance of the evidence that he was one of the assailants, and therefore summary judgment must be granted in his favor. The Court agrees.

---

**13.** In *Johnstone,* the Third Circuit acknowledged a potential problem resulting from the "constitutional standard [changing] at some particular moment during an encounter between a citizen and a law enforcement official." 107 F.3d at 207. The line of demarcation between arrest and pretrial detention drawn by the Ninth and Tenth Circuits and adopted by this Court should minimize this concern.

**14.** Given this conclusion, the Court need not address the second question left open in *Graham,* whether the Fourth Amendment standard extends into the period of pretrial detention.

In *Anela v. City of Wildwood,* 790 F.2d 1063, 1068 (3d Cir.1986), the Third Circuit upheld a directed verdict in favor of individual defendant officers in a § 1983 action where the plaintiffs could not identify the officers alleged to have violated their constitutional rights.[15] The plaintiffs in *Anela,* six young women, were arrested one night with four other individuals for violating Wildwood's anti-noise ordinance. *Id.* at 1064. The ten arrestees were taken to the police station where they were detained. Nine of the ten arrestees were women. The one male arrestee was released after paying the sum of $200. He later returned with $700 and unsuccessfully attempted to have the others released on bail. The female arrestees, including the plaintiffs, were detained in holding cells until 11:00 a.m. the next morning. *Id.* Plaintiffs filed § 1983 claims against the City of Wildwood, its chief of police, and several Wildwood police officers, alleging *inter alia* "that the release of the one male arrestee on bail violated their rights to equal protection."[16] *Id.* at 1064–65.

The district court dismissed several of plaintiffs' claims, including the equal protection count against the City of Wildwood. Thereafter, the case proceeded to trial on two issues, one of which was the equal protection claim against the individual officers. *Id.* at 1065.

At trial, plaintiffs admitted into evidence police log sheets indicating which officers were on duty at the police station on the night in question. *Id.* at 1067. Plaintiffs did not present any evidence, however, identifying which officers were responsible for their detention. *Id.* At the close of plaintiffs' case in chief, the defendant officers moved for a directed verdict under Fed.R.Civ.P. 50 on the equal protection claim, stating as grounds that "plaintiffs had not specifically identified the individuals who booked them and locked them up." *Id.* at 1065. Agreeing with the officers, the district court granted a directed verdict in their favor, dismissing plaintiffs' equal protection claim. *Id.* at 1068.

On appeal, the Third Circuit upheld the directed verdict, reasoning:

"[the police log sheets] at most establish[ ] that the six individual defendants, among others, were on duty during the shifts in question. The evidence establishes that ... the arresting officers did not participate in booking the plaintiffs. Two defendants were civilian dispatchers, and no evidence suggests that the dispatchers had duties with respect to booking and detention. There is evidence that the other individual defendants were on duty, but no evidence as to where or in what capacity. Looking at the evidence of record in the light most favorable to plaintiffs, we conclude that the trial court properly granted the motion for a directed verdict in favor of the individual defendants."

*Id.*

Hill, like the plaintiff in *Anela,* cannot identify the officers alleged to have subjected him to excessive force. Hill argues, however, that sufficient circumstantial evidence exists for a reasonable jury to find that defendant Makuka is "more likely than not one of the individuals who assaulted [him] while he was in the holding cell." Pl.'s Br. at 39. Essentially, Hill's circumstantial case is the following:

1. Evidence exists that Hill was not bleeding at the time he was placed in the holding cell at the Bellmawr Barracks;

---

15. Although decided in the posture of a directed verdict, *Anela* is apposite to Hill's claim. *See Alter v. SCM Office Supplies, Inc.,* 906 F.Supp. 1243, 1246 (N.D.Ind.1995) (summary judgment standard mirrors directed verdict standard); *Nunez v. Monterey Peninsula Engineering,* 867 F.Supp. 895, 901 (N.D.Cal. 1994) (summary judgment standard is identical to directed verdict standard).

16. In addition, plaintiffs asserted fourteenth amendment violations based on the length and condition of their detention and fourth and fourteenth amendment claims for false arrest. 790 F.2d 1063 at 1064–65.

2. Hill testified in his deposition that he was beaten in the holding cell by a group of unknown state troopers;

3. Defendant Makuka was alone with Hill during the period immediately before Investigator Bentham entered the holding cell;

4. In his deposition, Bentham stated that when he walked into Hill's cell, he noticed Hill had blood on his hands, head, and clothing. Bentham also testified that Hill had a cut near his hairline and was holding a Kleenex to his head;

5. Defendant Makuka stated in his deposition that he cannot recall any blood and/or injuries described by Bentham;

6. Assistant Prosecutor James Conley recalled a young black male in the Bellmawr holding cell yelling and holding something over his eye;[17]

7. During his deposition Hill recalled that a sergeant had entered his cell, left without giving him some water, and then several individuals came in and struck him over the head with flashlights and walkie-talkies.

The Court finds that taking the above facts and all reasonable inferences therefrom in a light most favorable to Hill, the record remains speculative as to Makuka's involvement in the alleged beating. At most, the above deposition accounts place Makuka with Hill sometime after the beating took place. While this fact, when joined with Bentham's testimony disputing Makuka's account that Hill was not bleeding, might support the claim against Makuka for failure to provide medical care,[18] it fails to establish that Makuka was more likely than not one of the assaulting officers. Furthermore, although Makuka spent time alone with Hill before he was taken into another room to give a statement, Hill does not assert that Makuka physically abused him during this time.[19] Therefore, summary judgment will be granted as to that portion of Hill's claim alleging that Makuka personally subjected him to excessive force.[20]

### D. COUNT FOUR: VIOLATION OF 42 U.S.C. § 1983—SUPERVISORY LIABILITY

■ Hill alleges that Makuka and Kwap are personally liable for his purport-

17. Defendants argues this statement constitutes inadmissible double hearsay, because it is contained within an internal investigation report. Defendants are mistaken, however, in that Mr. Conley is recalling that which he perceived rather than repeating the statements of others. The Court does note that Hill has not provided any foundation for a business record exception, and thus a potential hearsay problem exists. The Court need not be concerned with this problem, however, because its decision does not turn on Mr. Conley's account.

18. This claim is discussed *infra* part V.

19. As Makuka is the only officer who is certain to have been with plaintiff in the cell on the night in question, plaintiff arguably would have a stronger circumstantial case against Makuka had there been only one attacker. Because plaintiff asserts he was beaten by a group of troopers, however, the fact that Makuka spent time alone with him in his cell ceases to be sufficiently probative of whether Makuka was one of these assailants.

20. Consistent with the Third Circuit's holding in *Anela*, other courts have granted summary judgment for defendants in § 1983 cases where the plaintiff could not identify the accountable state actors and the circumstantial evidence of said actors' identities was too attenuated. *See e.g., Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir.1996) (affirming summary judgment in favor of defendant officers to § 1983 excessive force claims arising from search of plaintiffs' home pursuant to warrant where plaintiffs could not identify officers who had applied excessive force and evidence simply revealed that defendant officers were in plaintiffs' home when alleged violations occurred); *Thornton v. Spooner*, 872 F.2d 1029, 1989 WL 34026, at *2 (6th Cir. Mar. 21, 1989) (affirming summary judgment to § 1983 excessive force claim arising out of plaintiff's arrest where plaintiff was unable to identify officer who allegedly pushed him into police car).

ed assault at the Barracks by the unidentified state troopers.[21] "Traditional concepts of respondeat superior do not apply to civil rights actions arising under 42 U.S.C. § 1983." *Bieros v. Nicola*, 860 F.Supp. 226, 234 (E.D.Pa.1994). A supervisory official may be personally liable under § 1983, however, where the official either "directed others to violate [plaintiff's constitutional rights] or had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir.1995). Although this standard requires that the supervisory official have actual knowledge of the misconduct, such knowledge "can be inferred from circumstances other than actual sight." *Id.*

*1. Makuka*

 Hill presents no evidence that Makuka directed his assault by the state troopers. Thus, the Court addresses only whether sufficient evidence exists for a reasonable jury to find that Makuka knew of and acquiesced in the alleged assault. After carefully reviewing the record and drawing all reasonable inferences therefrom in favor of Hill, the Court concludes that summary judgment should be granted for Makuka on the § 1983 supervisory liability claim.

In his deposition, Hill testified that a sergeant, who had offered him a glass of water, entered the holding cell and exited just before the group of unidentified state troopers came in and assaulted him. Pl.'s Ex. A at 56. While undisputed that Makuka was a sergeant at the Bellmawr Barracks on the night in question, Defs.' Ex. 6 at 138–39, it is also uncontested that Ma-

kuka was off-duty on this night but then summoned to the Barracks to interview Hill regarding the events surrounding Trooper Baker's shooting. *Id.* at 141. Hill presents no evidence that Makuka was the sergeant arguably connected to the unprovoked beating. Hill admits he spent some time alone with Makuka in his cell and an additional approximate one hour forty-five minutes with him in the interrogation room. (Pl.'s Br. at 6–8.) Notwithstanding ample opportunity to observe Makuka, Hill cannot identify him as the mysterious sergeant who left the cell before his assailants entered.[22] As Hill has proffered no evidence, direct or circumstantial, from which the Court can infer that Makuka had actual knowledge of and acquiesced in the alleged attack on Hill, summary judgment will be granted.[23]

*2. Defendant Kwap*

 It is undisputed that Kwap was the Barracks shift supervisor on the night of Hill's detention. Defs.' Ex. 5 at 35. The Bellmawr Barracks is a state trooper facility with only one holding cell. *Id.* at 44. Sharing this facility with the Bellmawr personnel was the Camden City Initiative, with which outfit troopers Algor, Meyer and Makuka belonged. *Id.* at 52.

Kwap states in his deposition that the Initiative, a separate state trooper entity with separate facilities and its own detectives, used the Barracks as a processing center. *Id.* In an attempt to shield himself from supervisory liability resulting from Hill's alleged assault, Kwap insists, and Hill does not dispute, that Kwap was neither involved with the Initiative nor had

**21.** Although their identity remains unknown, sufficient evidence exists for a reasonable jury to find that troopers did in fact assault Hill at the Barracks. *See supra* Part C.2b.

**22.** Had plaintiff presented evidence that Makuka was the only sergeant at the barracks that night, this might be sufficient to defeat summary judgment. In reiterating that discovery is complete, the Court draws attention to the fact that plaintiff has failed to limit the

universe of potential candidates, i.e., listing by name the sergeants on duty on the night in question, from which the phantom sergeant's identity could be determined.

**23.** For the same reasons, Hill's claim against Makuka which alleges violation of 42 U.S.C. § 1983 for failure to prevent or intervene in the assault also fails. Therefore, summary judgment will be granted with respect to this portion of count three of the complaint.

any subordinates who were part of the Initiative. *Id.* Although no evidence has been presented as to the specific outfit, be it the Initiative or Bellmawr, to which the assaulting troopers belonged, such a distinction fails to be legally significant. The Barracks is a New Jersey State Trooper facility with only one holding cell. Standard operating procedure mandates that the shift sergeant be notified when a detainee is placed in the holding cell. *Id.* at 45. Also with respect to the holding cell, the relieving shift supervisor is advised of what has occurred therein during the previous shift and what jobs remain for the upcoming shift. *Id.* at 44. Thus, it is clear that a portion of Kwap's responsibilities as shift supervisor of the Barracks included overseeing the condition and use of the holding cell.[24] *Id.* at 43–45. For purposes of § 1983 supervisory liability, the Court therefore concludes that Kwap, by virtue of his position as acting shift supervisor of the Barracks, assumed a supervisory role with respect to Hill's alleged beating by state troopers occurring in the Barracks' holding cell.

Now that it has been determined that Kwap qualifies as a supervisor subject to supervisory liability under § 1983, the next issue for resolution is whether Kwap knew of and acquiesced in the assault of Hill.[25] Arguing for summary judgment, Kwap claims that while on duty, he had no knowledge that Hill was being detained in the holding cell, much less that troopers were beating him with flashlights and walkie-talkies. Kwap's own testimony, however, undercuts his assertion that he did not know of Hill's detention at the Barracks. First, Kwap admits that it was standard procedure for him, as shift supervisor, to be informed when detainees were placed inside the holding cell. *Id.* at 45. Moreover, inconsistent with his insistence

that he "did not know there was someone in the holding cell," *Id.* at 88, Kwap recalls that "there were several, several people brought in[to the Barracks] by different subjects regarding the shooting of Trooper Baker." *Id.* at 76. Although "several people were brought in[to the Barracks]" on the night in question, Kwap claims that he did not look into the holding cell, Pl.'s Ex. G at 89, and does not remember walking past the cell, *Id.* at 105, which was centrally located approximately 30 feet from his desk. Pl.'s Stmt. of Material Facts at 6.[26] Kwap admits, however, that had he "known that a prisoner was in the cell, [he] would have periodically checked on his status." *Id.* at 88.

Moreover, in explaining the standard procedure for bringing in detainees, Kwap stated that the detainee would be taken into the holding cell and handcuffed to the bench. Defs.' Ex. 5 at 37; Pl.'s Ex. G at 66. Access to the cell required a key, which was kept either inside the shift supervisor's desk or on a hook underneath the desk. Pl.'s Ex. G at 66. While Kwap does not recall giving anyone the key to the cell on the night of Hill's detention, it is undisputed that officers had access to the cell. Both Makuka and Bentham recall the door to Hill's cell being open when they entered to take Hill to the interrogation room, Pl.'s Ex. G at 101; Ex. L at 26, and that a number of people were standing in the hallway to the cell. Defs.' Ex. 6 at 179.; Pl.'s Ex. L at 27. Makuka further described the atmosphere at the Barracks that night:

> Hundreds [were] in the Barracks [sic] I'm not sure, it was very crowded. It was, it was a subdued atmosphere. People were talking in hushed tones. We had numerous people there of importance. The Colonel of the state police was there. The [sic] I believe represen-

---

**24.** Other obligations included preparing squad and automobile assignments and reviewing administrative reports. *Id.* at 42–43.

**25.** Hill presents no evidence indicating that Kwap ordered the attack.

**26.** Under L. Civ. R. 56.1, facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.

tatives from the Attorney General's office were there. The prosecutor was probably there although I don't know who he was.

Ex. 6 at 176–77. Taking all of the above in a light most favorable to Hill, a reasonable jury could find that Kwap knew of Hill's detention, further creating a reasonable inference that Kwap had knowledge of and acquiesced in Hill's assault. *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1193–94 (3rd Cir.1995) (reversing summary judgment and remanding for trial § 1983 supervisory liability claim where there was sufficient evidence to create reasonable inference that supervisor, who was not present during alleged use of excessive force by subordinates, knew of and acquiesced in such treatment); *Walmsley v. City of Philadelphia*, 872 F.2d 546, 552 (3rd Cir.1989).

Finally, there is no meaningful dispute regarding Kwap's entitlement to qualified immunity. The right to be free from an unprovoked beating while in police custody is clearly established. *See e.g., Thompson v. Montemuro*, 383 F.Supp. 1200, 1203 (E.D.Pa.1974). Summary judgment therefore will be denied.

### E. COUNT THREE: FAILURE TO PROVIDE MEDICAL CARE

Hill asserts against Makuka and Kwap § 1983 claims for failure to provide him with medical care ("medical care claims") during his custody at the Barracks. In light of this Court's finding that Hill was an arrestee during such custody, Hill now seeks application of the Fourth Amendment "objective reasonableness" standard to his medical care claims. Bound by *Groman v. Manalapan*, this Court must deny

Hill's request and apply the "deliberate indifference" standard to these claims.

In *Groman*, the Third Circuit applied the "deliberate indifference" standard to plaintiff's § 1983 medical care claim arising out of events occurring during his post-arrest detention at the police station. In utilizing this standard, the court of appeals stated, "[f]ailure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3rd Cir. 1995). The court of appeals, however, did not define "custody" nor otherwise indicate where along the custodial continuum the deliberate indifference standard applies. However, the standard has been applied to § 1983 medical care claims arising out of one's arrest. In *Walmsley v. City of Philadelphia*, the court of appeals reversed a directed verdict, concluding that a jury could reasonably infer that certain officers were deliberately indifferent to plaintiff's medical needs during the course of his arrest and transport to the station. 872 F.2d 546, 552–53 (3d Cir.1989) (emphasis added). *Groman* and *Walmsley* therefore provide that the deliberate indifference standard governs such claims arising out of one's arrest and post-arrest detention. Accordingly, Hill's medical care claims will be assessed according to the deliberate indifference standard.[27]

Makuka and Kwap argue that Hill cannot show that they were deliberately indifferent to his serious medical needs. Defs. Br. at 28. First, the defendants argue there is no genuine dispute as to the seriousness of Hill's injuries.[28] A medical

---

**27.** The Court recognizes that, as a result, Hill's excessive force claims and medical care claims will be assessed under different standards. Whether a uniform standard should be applied to both types of claims arising out of post-arrest but pre-arraignment detention, however, is a matter best resolved by the court of appeals.

**28.** Makuka and Kwap argue that the Court's June Opinion finding as a matter of law that Hill's injuries do not amount to a "permanent loss of a bodily function, permanent disfigurement or dismemberment" under the New Jersey Tort Claims Act, Op. at 19, demonstrates that Hill's injuries were not "serious" for § 1983 purposes. As the "serious injury" standard under § 1983, clearly fails to be

need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Co. Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir.1987). Moreover, where plaintiff's injuries turn out not to be serious, liability may still lie where "at the time of the alleged violation the threat of serious injury . . . existed" and therefore "[the officers had] reason to suspect [the injuries were] serious." *Lattany v. Four Unknown U.S. Marshals*, 845 F.Supp. 262, 268 (E.D.Pa. 1994).

 According to Bentham, Hill had "a gash on his head," Pl.'s Ex. L at 31, and had blood on his head, hands, and clothing. *Id.* at 28. Bentham further recalls seeing some blood on the bench to which Hill was handcuffed. *Id.* at 29. Were the jury to believe Bentham's account of Hill's injuries, they could conclude that Hill's gash to the head is the type of injury that a lay person easily would recognize as requiring medical treatment. Furthermore, Hill testified that upon release from the Barracks he checked into Cooper Hospital where he received stitches in his head. Defs.' Ex. 1 at 217. Reviewing the record in a light most favorable to Hill, a jury could find that Hill sustained serious injuries warranting medical treatment.

Both Makuka and Kwap next contend that Hill has presented no evidence which indicates they were deliberately indifferent to his medical needs. Defs.' Reply Br. at 16. The Court will address each defendant in turn.

### 1. Makuka

Makuka asserts that he did not perceive Hill as having any serious injuries, *id.*, and

that he saw no blood on Hill's person or clothing. Pl.'s Ex. 6 at 209. In his deposition, Makuka admits that while he saw an injury about [Hill's] face, it was the sort of "minor abrasion . . . that if my children were to have such an injury, I would say get back in the game." *Id.* at 185. It is undisputed that Makuka was in Hill's holding cell immediately before Bentham entered the cell to take Hill to the interrogation room. It is at this point that Bentham observed the gash in Hill's head and blood on his head, hands, and clothing. Determining Makuka's credibility is an issue for the jury. Given the apparent inconsistency between Makuka and Bentham's testimonies concerning Hill's physical condition, a reasonable jury could disbelieve Makuka's testimony, finding that he was indeed aware of Hill's serious injuries. Furthermore, it is undisputed that Makuka did not offer to render medical aid to Hill.[29] Thus, were a jury to find that Makuka did perceive the seriousness of Hill's injuries, it could further find that he was deliberately indifferent to those injuries. Summary judgment will be denied.

### 2. Kwap

Insisting that he was unaware that Hill was being detained at the Barracks on the night in question, Kwap argues that he could not have been deliberately indifferent to Hill's injuries. The Court already has determined that genuine issues exist as to Kwap's awareness of Hill's detention and alleged beating. *See. supra* Part D.2. Were a jury to find that Kwap acquiesced in Hill's assault, it could further find that he was aware of Hill's injuries resulting from the assault. *Walmsley*, 872 F.2d at

tantamount to the "permanent injury" standard under the New Jersey Tort Claims Act, *see infra* Part I, the Court rejects this argument.

**29.** Relying upon the deposition testimony of Bentham, wherein he claims to have offered to Hill medical aid, which Hill allegedly de-

nied, Pl.'s Ex. L at 31–32, Makuka argues that he "certainly did [sic] perceive the need to repeat the offer." Defs.' Reply Br. at 17. Hill has not admitted, however, that Bentham asked whether he needed medical attention; thus, a question remains for the jury as to that fact. *Walmsley*, 872 F.2d at 552, n. 4.

552–53. Therefore, summary judgment will be denied.[30]

### STATE CLAIMS

### F. COUNT FIVE: ASSAULT

 In count five of the second amended complaint, Hill alleges that Meyer "wilfully, wantonly and intentionally assaulted and battered [him]" and that "[a]s a direct and proximate result of the aforesaid assault and battery, [he] sustained severe injuries" from which he has suffered and will continue to suffer in the future. Second Am. Compl., ¶¶ 34, 35. When effecting an arrest, a police officer may use such force as is reasonably necessary under the circumstances. *See State v. Williams*, 29 N.J. 27, 148 A.2d 22, 29 (1959). To determine whether the force used was excessive, it is necessary to examine "the facts as they reasonably appeared to the officer at the time of the occurrence." *Id.* Where a police officer uses excessive force in effectuating an arrest, that officer may be liable for assault and battery.

As the Court has already indicated, there is uncertainty regarding the amount of force that Meyer used in arresting Hill. *See supra* Part C.2. There is also uncertainty regarding the actual events leading up to Hill's arrest and the extent of Hill's resistance to arrest, making it impossible for the Court to determine at this time what amount of force would have been reasonable for Meyer to use. *See id.*

 Meyer argues that he enjoys immunity from Hill's state law claims pursuant to the New Jersey Tort Claims Act, specifically N.J.S.A. 59:3–3. *See* Defs.' Br. at 38. This statute provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law" but prohibits exoneration "from liability for false arrest or false imprisonment." N.J.S.A. 59:3–3. The "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3–3. *See Lear v. Township of Piscataway*, 236 N.J.Super. 550, 566 A.2d 557, 558–59 (1989). Therefore, the same uncertainty that prevents the Court from determining as a matter of law whether Meyer enjoys qualified immunity with regard to Hill's 42 U.S.C. § 1983 excessive force claim also prevents the Court from determining as a matter of law whether the New Jersey Tort Claims Act shields Meyer from liability for allegedly assaulting Hill.

 Moreover, Meyer is not entitled to any immunity under the New Jersey Tort Claims Act if he engaged in "willful misconduct" when he allegedly used excessive force to arrest Hill. *See* N.J.S.A. 59:3–14 (The New Jersey Tort Claims Act does not shield a public employee from liability "if it is established that his conduct was outside the scope of his employment[31] or constituted a crime, actual fraud, actual malice or willful misconduct."). Willful misconduct is " 'the commission of a forbidden act with actual (not imputed) knowledge that the act is forbid-

---

**30.** Both Makuka and Kwap also assert qualified immunity defenses. A person's right "not to suffer deliberate indifference to serious medical needs" while in police custody, however, is clearly established. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Boring v. Kozakiewicz*, 833 F.2d 468 (3rd Cir.1987). Thus, defendants cannot shield themselves from liability under qualified immunity.

**31.** Acts that are committed within the scope of employment are "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *PBA Local No. 38 v. Woodbridge Police Dept.*, 832 F.Supp. 808, 829–30 (D.N.J. 1993) (quoting *Marley v. Borough of Palmyra*, 193 N.J.Super. 271, 296, 473 A.2d 554, 567 (1983)). There is no dispute that the actions Meyer took with regard to Hill were taken as part of Meyer's job as a police officer securing a crime scene.

den'.... [I]t requires much more than an absence of good faith and 'much more' than negligence." *PBA Local No. 38 v. Woodbridge Police Dept.*, 832 F.Supp. 808, 830 (D.N.J.1993) (quotation omitted). As there exists a genuine issue of material fact regarding whether Meyer engaged in willful misconduct, the Court cannot determine as a matter of law whether the New Jersey Tort Claims Act shields Meyer from liability for his actions. Consequently, the Court will deny Meyer's motion for summary judgment with regard to count five of Hill's second amended complaint.

### G. COUNT VII: RESPONDEAT SUPERIOR

■ Hill asserts a respondeat superior claim against Kwap as the Barracks shift supervisor, for his alleged assault by state troopers. Hill's theory of liability is misplaced, however, as respondeat superior lets a cause of action lie against an employer, on the basis of vicarious liability, for the actions of its employees. *See e.g., Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 650 A.2d 958, 963 (1994). As Hill cites no authority extending this doctrine to hold a supervisor vicariously liable for the conduct of his subordinates, this claim is dismissed.[32]

### H. COUNT NINE: MALICIOUS PROSECUTION AND FALSE ARREST

Hill alleges that Meyer falsely arrested and maliciously prosecuted him. *See* Second Am. Compl., ¶ 46. Hill claims that the charges against him were groundless. *See id.*, ¶ 47. He further claims that his arrest was made "with malice, for improper purposes and with reckless disregard of the total absence of probable or reasonable causes [sic] for such charges." *Id.*, ¶ 48.

#### 1. False Arrest

■ A plaintiff proves a false arrest claim by "showing that the plaintiff's liberty was unlawfully constrained as a result of force or threat of force, on the part of a defendant." *Roth v. Golden Nugget Casino/Hotel, Inc.*, 576 F.Supp. 262, 265 (D.N.J.1983) (citing New Jersey law). If the defendant proves that he had probable cause to arrest the plaintiff, then the plaintiff's false arrest claim fails. *See Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir.1995). The Court has already determined that there exist genuine issues of material fact regarding whether Algor and Meyer had probable cause to arrest Hill. *See supra* Part C. Therefore, the Court will deny Meyer's motion for summary judgment with respect to the false arrest claim.[33]

#### 2. Malicious Prosecution

■ To prove malicious prosecution under New Jersey law, the following elements must be present:

(1) a criminal proceeding must have been instituted or continued by the defendant against the plaintiff;

(2) terminated in favor of the accused;

(3) with absence of probable cause for the charge; and

(4) with malice (which may be inferred from lack of probable cause) or primary purpose other than bringing the offender to justice.

*Voytko v. Ramada Inn of Atlantic City*, 445 F.Supp. 315, 322 (D.N.J.1978). In fact, the requirement that the underlying action must have "terminated in favor of

---

**32.** *Trustees Structural Steel v. Huber*, 136 N.J.Super. 501, 347 A.2d 10 (1975), the only case Hill cites for broadening the doctrine of respondeat superior, is inapposite as it pertains to the personal liability of officers and directors of a corporation under New Jersey corporate law. Furthermore, while a claim would lie against Kwap if he had ordered the assault of Hill, the record does not support such a finding.

**33.** For the same reasons, the Court previously denied Algor's motion for summary judgment with regard to Hill's allegation of false arrest. (*See* Op. dated June 1, 1999 at 14.)

the accused" is a condition precedent to the institution of an action for malicious prosecution; a cause of action for malicious prosecution does not even accrue until the criminal proceeding has terminated in the plaintiff's favor. *See Pisano v. City of Union City,* 198 N.J.Super. 588, 487 A.2d 1296, 1299 (1984). By Hill's own admission, determination of the obstruction of justice charge against him was scheduled for October 4, 1999 in the Camden County Courthouse. *See* Pl.'s Opp'n Br. at 54. Therefore, Hill's cause of action against Meyer for malicious prosecution, filed on March 22, 1999, ceases to be ripe. The Court will dismiss this count of Hill's second amended complaint without prejudice.

## I. LIMITATION OF DAMAGES

Meyer argues that the New Jersey Tort Claims Act prevents Hill from recovering damages for pain and suffering due to their alleged state law violations. *See* Pl.'s Br. at 39. N.J.S.A. 59:9–2(d) provides as follows:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.

This restriction has been justified as follows:

> The limitation on the recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances—cases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000. The limitation that pain and suffering may only be awarded when medical expenses exceed $1,000 insures that such damages will not be awarded unless the loss is substantial.

N.J.S.A. 59:9–2 cmt.

In the June Opinion, the Court previously determined, "Hill has failed to present evidence that he has suffered a 'permanent loss of a bodily function, permanent disfigurement or dismemberment.'" In doing so, the Court explained:

> The best evidence of a permanent injury that Hill has offered is a statement made by Gerald Roth, D.C. ("Roth"), of the Tristate Therapy Center. In a letter to Hill's counsel, Roth wrote that Hill has suffered "[a] significant limitation of the musculoskeletal system." Pl.'s Opp'n Br., Ex. O. This statement does not, however, suggest that Hill has suffered a "permanent loss of bodily function, permanent disfigurement or dismemberment." The New Jersey Tort Claims Act therefore precludes Hill from recovering for the pain and suffering he allegedly endured as a result of defendants' actions.

(Op. dated June 1, 1999 at 19.) [34] Notwithstanding this finding, the Court declined to

---

**34.** In addition to the letter by Roth, Hill has presented evidence indicating that he has sustained some injury to his spine and knee, as well as scarring to his face near his eyelids. (See Pl.'s Exs B & L). However, these injuries fail to render Hill eligible for recovery under the Tort Claims Act. *See Brooks v. Odom,* 150 N.J. 395, 696 A.2d 619, 624 (1997) (concluding that plaintiff had not sustained "permanent loss of bodily function" within meaning of Tort Claims Act where plaintiff suffered injuries to neck, upper, middle and

**414**

order at that time that Hill be denied pain and suffering damages, explaining "if the jury determines that [the defendant] engaged in willful misconduct, [he] will receive no protection from the New Jersey Tort Claims Act and Hill's pain and suffering claim may proceed." *Id.* For the same reasons, until a jury ascertains whether Meyer engaged in willful misconduct, the Court cannot determine if Hill is barred from pain and suffering damages arising out of Meyer's alleged misconduct. *See* N.J.S.A. 59:3–14.

## III. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. The Court will enter an appropriate order.

lower back after being struck by moving city bus, continued to suffer from post-traumatic headaches, dizziness and severe lower back pain which radiated into lower left leg for

months after accident, and plaintiff's physician diagnosed plaintiff with significant and permanent loss of function).